NORRIS GRAIN CO. OF NEW YORK, Inc., v.
EMPIRE CANAL CORPORATION et al.

MILMINE BODMAN & CO., Inc., v. SAME.

THE HERKIMER.

District Court, E. D. New York.

July 18, 1930.

Otto & Lyon, of New York City (Henry E. Otto, of New York City, of counsel), for libelants.

Rumsey & Morgan, of New York City (John Tilney Carpenter, of New York City, of counsel), for claimants.

GALSTON, District Judge.

By stipulation these causes in admiralty were tried together.

The libelant Norris Grain Company of New York, Inc., was the owner of all of the grain loaded on the barge No. 237, and Milmine Bodman & Co., Inc., was the owner of all of the grain loaded on the barge No. 217. As a result of an accident at Sylvan Beach on Lake Oneida, September 6, 1924, these barges went adrift and the cargoes were damaged.

The shipments of grain were made pursuant to written agreements between the libelants and the Empire Canal Corporation. The latter was a private carrier and had the steamer Herkimer under a demise charter.

The libelants contend that the loss of and damage to the cargoes were caused by the negligence of the steamer Herkimer.

The claimant seeks to avoid liability on the ground that there was no waiver by the steamship Herkimer of the benefits of section 3 of the Harter Act (46 USCA § 192), and that the term "negligence" used in the Produce Exchange Charter Party should not be construed to embrace any duty beyond that of using diligence in making the vessel seaworthy and having her properly manned, equipped, and supplied at the commencement of the voyage. On the merits also the claimant contends that there was no negligence on the part of the Herkimer, even assuming that section 3 of the Harter Act, U. S. Code, title 46, § 192 (46 USCA § 192), does not apply.

The Produce Exchange Charter Party adopted by the parties in making their agreement contained the following:

"It is agreed between the Carriers and Shippers and Assigns, in consideration especially of the rate of freight herein named, the Carriers having supervised the weighing of such cargo inward, that the bill of lading quantity shall be conclusive as between shippers and assigns and carriers as to quantity of cargo received inward, and to be delivered on final delivery, and that the Carriers de-

liver the full quantity named in the bill of lading. The boat owner and/or operator and/or carrier shall not be liable for losses caused by dangers of navigation, fire or collision, except where caused by negligence. Neither shall said boat owners and/or operators and/or carriers be liable for acts of God, quarantine, or the public enemy. All damage caused by negligence or fault of the boat owners and/or operator and/or carrier or deficiency in the cargo from quantity as therein specified shall be paid for by Carrier and deducted from the freight, and any excess in the cargo shall be paid for to the Carrier by the Consignees at the market price of a like kind and grade of grain at New York on the day when the shipment is delivered, all within ⅛ of one per cent either way."

It will be observed from the foregoing that under the exemption, the boat owner shall be liable for losses caused by dangers of navigation, etc., if resulting from negligence, i. e., the negligence of course of the carrier, and it is, moreover, expressly provided that damage caused by such negligence shall be paid for by the carrier. As a private carrier, the claimant was competent to contract for exemption from liability for negligence or to assume such liability. The adoption of the particular form of carriage contract, it seems to me, is inconsistent with a desire by the claimant to avail itself of the immunities of section 3 of the Harter Act. Moreover, the Harter Act does not of its own force apply to a private carrier, and if, as was held in G. R. Crowe (C. C. A.) 294 F. 506, sections 1 and 2 of the Harter Act (46 USCA §§ 190, 191) do not apply automatically to a private carrier, it would be illogical to hold that section 3, in the absence of specific agreement, should apply. See also Warner Sugar Refining Co. v. Munson Line (D. C.) 23 F.(2d) 194.

I do not read Sacramento Navigation Company v. Salz, 273 U. S. 326, 47 S. Ct. 368, 71 L. Ed. 663, on which the claimant relies, as establishing any new basis of liability. It may be noted, too, in that case that the petitioner was not a private but a common carrier.

■ There remains then the question of whether in point of fact negligence can be attributed to the Herkimer. It is contended by the libelants that the make-up of the tow was unusual; that the steamer was negligent in leaving Brewerton in view of the weather forecast and because of the conditions then existing; that good navigation indicated as less hazardous the alternatives of returning to Brewerton or heading for Cleveland, rather than proceeding to the Gap at Sylvan Beach; that the Herkimer, before entering the Gap, should have shortened the hawser to the hawser boat; and that the Herkimer was negligent in entering the Gap at an excessive rate of speed.

The tow on leaving Brewerton was made up of the Herkimer and a pushboat closely coupled to it at the head. There was a single hawser between the steamer and the hawser barge of between 350 and 450 feet in length. Beyond the hawser barge were the No. 237 and the No. 217, the latter being the stern barge. These barges had rigged cross-lines out, reel cables, and spring lines. The towing strain was taken up by the cross-lines.

The tow left Brewerton at 7 a. m. on September 6, 1924. The weather bulletin obtained by the captain of the steamer Herkimer from the chief operator at Lock 23, State of New York, read:

"September 5, 1924—Fair tonight and Saturday; slightly cooler tonight; northwest winds becoming fresh."

During the morning the breeze freshened, and Manchester, the observer at Cleveland, employed by the state of New York, called Sylvan Beach on the telephone and spoke to Charles Heagle, captain of the state of New York steamtug National, stationed at that point. He described the tow to Heagle and suggested that Heagle go out to give assistance. The National came out of the Gap at Sylvan Beach, proceeded about halfway to Cleveland, and then, having failed to locate the tow and having seen only a Standard Oil tanker, returned to Sylvan Beach. As a result of a second conversation, he took the National out again, at which time the wind was blowing at from thirty-five to forty-five miles. This time he reached the Herkimer near Messengers Shoals or Lewis' Point Buoy, about three miles east of Cleveland and about five miles west of Sylvan Beach.

As the result of a talk with the captain of the Herkimer, during which he offered service, he was directed by the captain of the Herkimer to put out a line to the pushboat, and as thus made up, the fleet proceeded to Sylvan Beach.

It may be said that Lake Oneida is rather a treacherous lake, and that the Gap at Sylvan Beach in stormy weather, or when the wind is high and surf heavy, is particularly dangerous. At the entrance to the Gap there was a breakwater on the south and one on

the north; and with a heavy sea washing against the south breakwater, such as prevailed at the time and on the day in question, the backwash was one to give the navigator pause. On entering the Gap, the hawser boat struck against a projection of the north breakwater, as libelants contend, and as I believe, with the result that the lines to barges 237 and 217 parted, with the resulting damage complained of.

It is not necessary to review all of the acts of negligence of which the libelants complain. I think it is sufficient to emphasize that the steamer Herkimer, in view of the weather bulletin which was received and which was a forecast for the next twenty-four hours, should not have left Brewerton on the morning of September 6th without making some effort to ascertain what the weather conditions were on the lake, for fresh winds on Lake Oneida bespeak difficulties in navigation. It is significant that on that whole day but one other boat, the Standard Oil tanker, which is self-propelled, crossed the lake.

That difficulty was reasonably to be expected is indicated by claimant's witness Manchester. It was only 8 a. m., or but an hour or so after the tow left Brewerton, that observing the condition at Cleveland he found it advisable to procure assistance for the Herkimer and her tow.

Now it may well be that having once embarked on the perilous voyage, it was better judgment to continue than to endeavor to turn back or to make for Cleveland, but that does not excuse the failure at Brewerton.

It is significant that at Sylvan Beach the tugs, Elsie K. and the Pearl Harbor, and their respective barges, tied up on the night of September 5th and awaited better weather conditions, despite the fact that it was less dangerous to proceed west bound into the wind, as they would have done, than to proceed east bound with the wind coming over the stern, as the Herkimer did.

There is conflicting testimony as to whether the hawser between the Herkimer and the hawser boat was shortened before entering the Gap. I am not convinced that the hawser was thus shortened. The long line at the Gap certainly added to the Herkimer's troubles.

It is also pertinent to remark that the Herkimer was making at least three miles per hour on approaching the Gap, and that, as even one of claimant's witnesses admitted, a speed of from two and a half to three miles per hour was excessive on entering the Gap.

Finally, it is apparent that the captain of the Herkimer did not take into consideration the cross-current or backwash from the south breakwater.

These were the contributing causes which brought about the accident.

As Judge Hazel said in Spencer Kellogg, Inc., v. Steamtug Tourist (D. C.) 16 F.(2d) 154, 156:

" * * * She [meaning the tug] was remiss, as already remarked, in not gradually reducing speed preparatory to passing through the gate; for, had her speed been bare steerageway, there would not, in my opinion, have been any disturbing backwash or interfering cross-current. She should have been navigated to avoid interfering cross-currents, or have counteracted them. This could have been done by proceeding somewhat further to starboard, which would have held the Stagg [hawser barge] firmly in line and directly astern of the tug. Although a steam tug is not a common carrier or insurer, when she engages in towing a fleet of barges, she is required to exercise reasonable skill and care in everything relating to the work until it is accomplished. The Margaret, 94 U. S. 494, 24 L. Ed. 146."

The weight of evidence points to the finding that the hawser barge struck the north breakwater. It has been held that the striking of a stationary object by a vessel in motion raises a presumption of negligence. U. S. v. Norfolk-Berkley Bridge Corporation et al. (D. C.) 29 F.(2d) 115.

The libelants may have decrees in accordance with this opinion.