**SELTZER et al. v. SUNBROCK et al.**

No. 1292.

District Court, S. D. California, Central Division.

March 8, 1938.

Lyon & Lyon, by Frederick S. Lyon, I. L. Fuller, and Frederick W. Lyon, all of Los Angeles, Cal., and Richard S. Kaplan, of Gary, Ind., for plaintiffs.

.J. Calvin Brown, Alan Franklin, W. H. Neblett, and Dailey S. Stafford, all of Los Angeles, Cal., for defendants Sunbrock, Spencer, Lang and Lee.

Haight, Trippet & Syvertson, by Oscar A. Trippet and Gerald P. Rosen, both of Los Angeles, Cal., for defendants Henderson.

John Quincy Gilchrist, of Los Angeles, Cal., for certain labor claimants.

Lyons & Lyons, of Los Angeles, for certain creditors.

Leo Schaumer, of Los Angeles, Cal., for Labor Commissioner of State of California.

JENNEY, District Judge.

The bill of complaint in this case contains two causes of action, one asserting an infringement of copyright and the other claiming unfair competition. It alleges in substance the following: Plaintiff Leo A. Seltzer, a resident of Oregon, is the author of two copyrighted books, or dramatic compositions, which describe a roller-skating race. An exclusive license to stage this competitive event was granted by the author to plaintiff Transcontinental Roller Derby Association, Inc., an Indiana corporation. The latter is now, and has been for three years, conducting such roller derbies in various eastern cities. The defendant Larry Sunbrock promoted and with defendants Spencer, Lang, and Lee produced in Los Angeles, California, a roller-skating race similar to that of plaintiffs. Defendants Henderson are the managers of the Pan-Pacific Auditorium in Los Angeles, the arena in which defendants' race was presented.

These races, both plaintiffs' and defendants', may perhaps be best described as sporting events in which teams of roller skaters compete against each other on a banked track, racing each evening for several hours, until a distance roughly equivalent to that across the continent has been covered. Admission is charged, and the spectators witness a competitive event analogous to a six-day bicycle race. Plaintiffs' show usually continues from two to four weeks; defendants' show actually lasted from November 17, 1937, until December 15, 1937.

Plaintiffs filed their bill of complaint on November 22, 1937, demanding damages in excess of $5,000 for infringement of copyright and unfair competition; and asking for a permanent injunction against defendants' performances. The following day, this court issued an order temporarily restraining defendants: (1) From infringing the copyrights, either by copying plaintiffs' books or by producing or imitating plaintiffs' productions of the copyrighted books; and (2) from doing any act calculated to cause defendants' spectacle to be confused with races put on by plaintiffs or their licensees. As a condition attached to the issuance of the order, this court required plaintiffs to post a bond in the sum of $10,000 "to answer all damages and costs if it shall be subsequently held that said order was improvidently granted."

Thereafter this court on its own motion, because of the extremely congested condition of its calendar, referred the entire matter, including the merits of the case, to a special master. He was instructed to report his conclusions of law and fact and his recommendations, as advisory only to this court, which reserved to itself the right to determine all matters of law and fact as fully as though this reference had not been made. It was announced that neither party would be required to file exceptions to the advisory findings or recommendations of the special master.

The court denied plaintiffs' request that defendants' race be stopped, but proposed to exact, as a condition to permitting its continuance, the posting of a bond sufficient to indemnify plaintiffs. Defendants were unable to provide such a bond. The court then directed the impounding of certain gate receipts, "subject to the further order of the Court," but declined plaintiffs' request that the funds be held in lieu of bond.

Upon motion of plaintiffs, and upon a recommendation contained in the preliminary report of the special master, the court, on December 7, 1937, issued an order requiring defendants to show cause why they should not be punished for contempt for failure to comply with the temporary restraining order. Defendants' demurrer to this order to show cause was sustained by the court, and the order dismissed on January 3, 1938. The court now finds that said temporary restraining order was improvidently granted.

On December 29, 1937, the court issued an order to show cause why certain preferred creditors of defendants should not be paid out of the impounded funds. After a hearing, at which evidence was taken as to the validity and priority thereof, the court ordered payment by the holder of the impounded funds of certain designated obligations, including the wages of certain skaters, and labor claims of certain employees.

Extended hearings were had before the special master, the record of which has been carefully examined by this court. The law involved has been presented by briefs of counsel, and the entire case is now before the court for final decision. The facts are substantially as follows:

The first of plaintiff Seltzer's two compositions was copyrighted in 1935, and is a printed pamphlet entitled "Transcontinental Tour, or a Roller Race across the United States.". It purports to be a drama, in which a "Cast of Characters" is given as follows:

"Colonel Leo Seltzer
"20 Teams of roller racers
"Track Judges
"Trainers
"An orchestra
"Announcers
"Timekeepers" etc.

The scene of action is designated as "any large coliseum or arena," and the time consumed as "25 days and 25 nights or more." The book, under the headings "Properties" and "Stage Settings," describes a typical sports arena with a banked oval track, around which are placed tiers of spectators' seats, and within which is an open space where cots, masseurs' tables, repair shops, lunch counters, and the orchestra are located. On one wall of the arena is hung a huge illuminated map of the United States, upon which the distance traveled by the various skaters each evening is indicated by means of vari-colored lights.

Under the heading "Action of Play," the book then sets out a description of how the race is to be run. No dialogue appears in the book. No characters are mentioned by name, except Leo Seltzer, who acts as an announcer or master of ceremonies. The actual "drama" consists of about two and a half pages of prose description of a mythical race. The general character of this composition may be shown by the following excerpts:

"Here comes an unfortunate contestant, who has lost a wheel from his skate. He's in the pit and right out again to try to regain his position and lost mileage. A colorful picture, that field of flashing silks as they speed past the spectators.

"Here comes an ambitious youngster trying to steal a lap on the field. He is challenged by the others who increase their pace and make it impossible for him to accomplish his desire. He settles back in his original position, winded and flushed with excitement.

"So far the boys of the teams have held the track, and now the fellow with the skate trouble retires, and his girl teammate takes up the grind. She is greeted with a hand from the crowd. Soon, other feminine members take to the track until the field is mixed with the male and female characters of this drama."

"Team number 20, who, incidentally, wear the banner of a large furniture house, are ten miles in the rear of the field, and eight miles short of the necessary 40 miles to reach their destination for the day. The boy increases his speed; and, as he rounds one of the turns, loses his balance and pitches headlong into the guard railing. He is injured and taken (to) the hospital for both treatment and diagnosis of his injuries. His right shoulder is badly bruised, and he is in great pain. His girl partner takes the track and tries to steal a lap on the steadily plodding field. They are tired and offer little resistance when she manages to pass them up and gains a lap and distance; but the second attempt on her part brings forth a sudden flurry from her competitors, and she is forced back. He is still in the hospital, and time grows short. Ten minutes remain, and it is up to the girl to bring team number 20 safely across the finish line.

"They are four miles behind. The crowd takes up the hue and cry to hurry. He is still out of the race with his injured shoulder, and she is rapidly losing strength. Her legs and arms are numb, and she is gasping for breath. Time—the gun sounds, and the announcer informs team number 20 that they are (out) of the running for failure to complete the required number of laps for that day. She comes in to the rest quarters with tears streaming down her cheeks."

"As the days go on, the mileage requirement is made more difficult; more couples are disqualified for rule infractions or in-

ability to complete the required number of miles set for each day; and more couples leave the track due to fatigue and exhaustion. At the conclusion of the tour, perhaps only two or three teams remain out of the original starting field to successfully make the trip across the United States on roller skates.

## "The end"

The second book by plaintiff Seltzer, copyrighted on October 18, 1937, is "A Dramatic Composition, entitled Roller Derby, or Coast to Coast Roller Skating Race Across United States." The cast of characters, scene, time, properties, and stage settings are all substantially the same as in the first composition. However, a new section called "Rules and Regulations" appears in the second work, setting forth in detail the rules under which the race is to be run. These restrictive directions are succinct prose statements without dialogue, designed for the regulation of the skaters and the information of the spectator. They make no reference to any individual performer, or to any individual character, except in such terms as "any skater," "any team," or "each skater."

Following this, the book then describes the "action of play" in much the same general style as the prior publication. The wording and ideas are somewhat different, however, and a new feature of the "drama" —the Open-House, or five-minute sprint period—receives considerable attention, the composition concluding with the following passage: "From time to time, because of the terrific speed, many partners fall but that does not stop the race as Open House continues for five minutes with no stops. The attendants are busy picking up fallen racers and the nurse and masseurs are very busy repairing lost pieces of epidermis. The audience is now on their feet and the din is terrific. The favorite is right behind the Italian Champion who has the flag—he plunges forward but the Italian also does the same and maintains his position. They are straining every fibre as they hear the announcement that there is only fifteen seconds more—they swing around the North turn—the favorite is now abreast of the Italian—they are on the straight-away— they near the turn—six seconds to go— The Italian slips and goes high on the bank coming out of the turn—with a desperate lunge the favorite cuts under him and now grabs the Red Flag and the lead— but the Italian is not through—with a burst of speed he comes up and they are almost again abreast as the gun sounds announcing the finish. The house is very noisy but becomes very quiet as everyone breathlessly await the announcement of the winner from the scorer's stand. The winner is........ .....................the Italian champ."

There is evidence that plaintiffs' "dramatic compositions" were sold as programs to the spectators at plaintiffs' performances. The printed pamphlets published by defendants, and claimed to infringe plaintiffs' copyrights, were also sold or distributed as programs for defendants' race. They were intended to be used by spectators as one means of gaining an understanding of what was taking place. On the cover, defendants' pamphlets proclaim: "Official Program, 3000 Mile National Championship Roller Skating Race, presented and produced by Larry Sunbrock, President, National Roller Skating Association of America. The Newest Things in Town. Don't Miss It. $5,- 000.00 in Prizes." Inside, these books announce the various officials of the race, designating the individuals who are to act in each official capacity. The teams of skaters are also listed, the names of each contestant being given. On page 2 of the program is the heading, "Rules and Conditions Governing This Race," under which are set out regulations for the conduct of the race. These do not purport to be anything except simple rules for the participation in and management of a straightforward athletic contest.

Defendants make no effort to adopt the format of a drama, either by the introduction of such headings as "dramatis personæ" or "stage settings," or by any description in narrative form of this or any other race. However, in substance and ideas, the rules governing this race are quite similar to the rules used in plaintiffs' "dramas." Nevertheless, the wording of the rules as set forth in defendants' program bears no practical similarity to that of plaintiffs' books. The order in which the rules are set out, the style of composition adopted, and the peculiar phraseology employed are distinct and different.

Plaintiffs contend that the copyrighted books are dramas; that defendants' printed programs are conscious imitations and substantial copies of the protected works; that defendants' race, as actually staged, constitutes an infringing dramatization of plaintiffs' copyrighted dramatic compositions; that plaintiffs are entitled to the

statutory penalty damages prescribed in the Copyright Act, § 25, as amended, 17 U.S.C. A. § 25; that defendants should be permanently enjoined from the production of such infringing races; and that plaintiffs are entitled to full costs and counsel fees.

After extended hearings, the special master filed a report setting forth his conclusions and recommendations. His conclusions may be summarized as follows:

1. The official program of the defendants is in no way an infringement of plaintiffs' copyrighted books. It was prepared wholly in ignorance of their contents; and in fact bears internal evidence that it was not written in similitude of or following the scheme outlined in the copyrighted Roller Derby booklets.

2. Plaintiffs' copyrighted works are treatments of a theme, and are in part original, in that plaintiffs incorporated certain novel ideas into that which had been public domain theretofore. As to those features which had been a part of the public domain, no dramatization by the defendants could be an infringement because such matters are not copyrightable. To the extent, however, that plaintiffs' features are original, they are copyrightable, and the use by defendants of plaintiffs' distinctive features constitutes an infringement.

3. While defendants did not have access to plaintiffs' material in preparing their printed program, nevertheless there was access before the actual staging of the race. There was therefore a substantial piracy of plaintiffs' works by defendants' production of the race.

4. There are two features in plaintiffs' books which are original, and which defendants are accused of using: (a) the open house, or free for all (a short period of intensive speed racing which occurs at a predetermined hour); and (b) the dog house or penalty box (a pen in which skaters guilty of violating the rules of the track are confined for a stated period while their opponents continue the race.)

5. There is no mention of the latter feature in defendants' printed program. Defendants did prepare a penalty box, but it was never used in any way in the race as actually produced.

6. From a standpoint of unfair competition, defendants' show as produced was not likely to mislead the public into believing that the show was in fact plaintiffs' or was in fact sponsored by plaintiffs. Plaintiffs therefore are not wronged in this regard.

The special master's recommendations are:

A. As to copyright infringement: Plaintiffs are entitled to an injunction against defendants' use of the dog-house and open-house features. No recommendation is made in regard to damages since no evidence was taken on that point.

B. As to the alleged unfair competition: Judgment should be for the defendants.

It has been stipulated by all parties that defendants Henderson are to be liable to plaintiffs only to the extent of the proceeds of the race, less actual operating costs paid by the Hendersons or Pan-Pacific Auditorium, Inc.

The whole matter now comes before this court for final determination.

The Copyright Act, § 1, 17 U.S.C.A. § 1 provides as follows:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work.

"(b) * * * to dramatize it, if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; * * *

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever."

Section 5 of the act, 17 U.S.C.A. § 5, provides for the classification of works for registration, listing thirteen classes into which the copyrighted matter may fall, specifying however that no error in classification shall invalidate or impair the copyright protection secured under this title. Two of these classes are:

"(a) Books, including composite and cyclopedic works, directories, gazetteers, and other compilations; * * *

"(d) Dramatic or dramatico-musical compositions."

Although the certificates of copyright registration filed in evidence indicate that plaintiffs' compositions were classed as *books,* plaintiffs contend that the pamphlets are, and could have been classified as, *dramatic compositions* and are entitled to full protection as such. The court therefore proposes to consider the rights which might accrue to plaintiffs under either classification.

■ It should be understood, of course, that there is nothing absolutely rigid about these various classifications. Provided partly at least for the convenience of the registry office, they are not intended to limit the subject-matter of copyright as defined in section 4 of the act, 17 U.S.C.A. § 4. They cannot, however, be considered altogether meaningless. Even a cursory reading of the act reveals the fact that certain provisions thereof pertain to all copyrighted matter, while others relate specifically to music, or to the drama or to some other special category. The precise scope of each class therefore becomes important in ascertaining the extent to which special provisions apparently applicable to one class may be governing as to other copyrighted matter. The statute itself is silent on this point. There are no clauses creating definite boundaries for each classification. Accordingly, that problem has fallen to the courts, which have been compelled to limit the subject-matter to be included in each class—in the light of the traditional purposes of copyright law and with due regard to the additional safeguards against piracy which the various amendments to the act have provided.

In recognition of this burden, then, as well as for the sake of convenience, this court will treat plaintiffs' copyrighted works from the viewpoint of possible ways of infringement; discussing first the protection afforded them as books and their possible infringement by defendants' printed programs, and, second, the rights reserved to the author of dramatic compositions, allegedly infringed by defendants' actual production.

■ Turning first to the protection afforded to books by the act: Section 1(a), 17 U.S.C.A. § 1(a), above quoted, reserves to plaintiff the exclusive privilege of "copying" and "reprinting" the copyrighted work. The cases construing this provision have made it clear that protection is afforded, not to the ideas therein expressed, but to the original wording, the distinctive word order, the literary style in which the ideas are presented. Chautauqua School v. National School, 2 Cir., 238 F. 151; Carr v. National Capital Press, 63 App.D.C. 210, 71 F.2d 220; Affiliated Enterprises v. Gantz, 10 Cir., 86 F.2d 597; Cf. Ansehl v. Puritan Co., 8 Cir., 61 F.2d 131. Thus if John Doe has copyrighted a description of the Battle of Gettysburg, he has not precluded any other historian from discussing or describing the events of that battle. He has merely preempted the right to narrate the incidents in that particular, original wording which he has employed. Another may relate exactly the same incidents, but in different words, and not thereby infringe the copyright, insofar as it covers a book, as such.

■ The cases, however, place a further restriction on the coverage accorded copyrighted books. The law is well settled that there must be an actual *copying,* whether willful or unintentional, but nevertheless a copying made possible by defendant's access to plaintiff's copyrighted material. As so aptly stated by Judge Learned Hand in Sheldon v. Metro-Goldwyn Pictures Corporation, 2 Cir., 81 F.2d 49, at page 54: "If by some magic a man who had never known it were to compose anew Keats' Ode on a Grecian Urn, he would be an 'author,' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats.' Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249, 23 S.Ct. 298, 47 L.Ed. 460; Gerlach-Barklow Co. v. Morris & Bendien, Inc., 23 F.2d 159, 161 (C.C.A.2nd); Weil, Copyright Law, p. 234."

■ In other words, it is not the *novelty* but the *originality* of the wording that is protected.

■ Applying these general principles to the facts at bar, the court finds ample evidence to support the master's conclusion that defendants' official program did not infringe plaintiffs' copyrighted books. In the first place, an actual comparison of the wording of the respective programs discloses no similarity of phraseology other than that necessitated by a common subject-matter. The style of plaintiffs' works is that of narration; that of the defendants, more or less unarranged direction. The former relates the rules of the spectacle in a manner calculated to thrill the reader. The latter is a cold, methodical, unimaginative summary of regulations. Even the format

of the respective pamphlets is dissimilar. These facts alone would support the master's conclusion, without the well-justified additional finding that defendants, before publication of their program, had no access whatsoever to plaintiffs' copyrighted works. The testimony on comparative dates of publication by itself fully supports this finding insofar as plaintiffs' later work is concerned. Defendants' program bears strong internal evidence of having been derived, not from plaintiffs' protected works, but from the sources common to both authors. The exhibits disclose that such roller-skating races have been staged under similar rules, at least since 1929; and that many of the features, more recently introduced, have been used in bicycle racing and in other sports for many years. The common knowledge of the average sports-minded citizen would quickly identify most of the rules in both programs as theretofore used in other sporting events. This is the standard of judgment which must be used in determining whether any similarity is due to copying, or to common source material. Cf. Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1; Echevarria v. Warner Bros. Pictures, D.C., 12 F.Supp. 632. An impartial reading of both works cannot but lead to the conclusion that defendants derived their materials, innocently, from those well-recognized sources in the public domain, and not culpably from plaintiffs' copyrighted books. Sheldon v. Metro-Goldwyn Pictures Corporation, supra.

Plaintiffs' reference to the "telephone directory" case (Leon v. Pacific Tel. & Tel. Co., 9 Cir., 91 F.2d 484) cannot advance his cause here, because in that case there was actually a substantial infringement of a printed directory by the reprinting of exactly the same names and telephone numbers as appeared in the Telephone Company's book. This same distinction applies with equal force to Hartfield v. Peterson, 2 Cir., 91 F.2d 998, where the evidence established access to, and actual piracy of, certain original phrases contained in a communications code.

It is clear that the master's conclusion is correct, that no infringement of the copyrighted books took place. On this point, then, defendants must prevail.

We turn now to plaintiffs' contention that the copyrighted pamphlets, as dramatic compositions, were infringed by defendants' race as produced. In order to consider this argument in the proper perspective, it is necessary to review briefly some of the fundamental principles of copyright practice which have been generally accepted by the courts.

It is conceded that a distinctive treatment of a plot or theme is properly the subject of copyright; and the sequence of incidents in the plot, taken in conjunction with its distinctive locale, and its original characterizations, will be protected. Sheldon v. Metro-Goldwyn Pictures Corporation, supra; Roe-Lawton v. Hal Roach Studios, D. C., 18 F.2d 126, per James, J.; London v. Biograph Co., 2 Cir., 231 F. 696. The absence of dialogue, however, is not fatal; the theme may be expressed in pantomime. Harper & Bros. v. Kalem Co., 2 Cir., 169 F. 61.

On the other hand, it is well settled that no central dramatic situation, in broad outline, can ever be protected by copyright. Sheldon v. Metro-Goldwyn Pictures Corporation, supra; Roe-Lawton v. Roach Studios, supra; Stephens v. Howells Sales Co., D.C., 16 F.2d 805; London v. Biograph Co., supra. Thus one cannot by copyright secure a monopoly over all plots based on the "eternal triangle." Nor can an isolated incident be permanently removed from the stage, merely because it has been used in a copyrighted work. Rush v. Oursler, D.C., 39 F.2d 468. Cases have held that the act does not protect distinctive locale (Echevarria v. Warner Bros. Pictures, D.C., 12 F. Supp. 632, per Yankwich, J.) mechanical devices used in production (Serrana v. Jefferson, C.C., 33 F. 347; Barnes v. Miner, C.C., 122 F. 480; Amdur, Copyright Law and Practice, p. 723), gestures or motions (Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1), or even the movements of a dance (Savage v. Hoffmann, C.C., 159 F. 584; Fuller v. Bemis, C.C., 50 F. 926; Martinetti v. Maguire, 16 Fed.Cas. p. 920, No. 9,173).

Applying these well-recognized principles to Seltzer's compositions: What are his original incidents or characterizations? What is his plot or theme, the distinctive treatment of which claims protection under the copyright laws? These questions suggest the more fundamental issue—a solution of which is necessary to a proper determination of this case—namely, are these pamphlets "dramatic compositions"?

The courts, in determining what constitutes a dramatic composition, have emphatically stated that there must be a story —a thread of consecutively related events

—either narrated or presented by dialogue or action or both. Daly v. Palmer, 6 Fed. Cas. p. 1132, No. 3,552; Amdur, Copyrights, p. 122 et seq. Attempts have been made to extend the protection afforded dramas under the act to other forms of composition spectacular in nature and theatrical in presentation, but lacking the story element. Even in the early days of interpretation of the Copyright Act, however, the distinction between a mere exhibition, spectacle, or arrangement of scenic effects on the one hand, and a true dramatic composition on the other, was well recognized. Witness the language of the learned judge in Martinetti v. Maguire, C.C.Calif.1867, supra: "The Black Crook is a mere spectacle—in the language of the craft a spectacular piece. The dialogue is very scant and meaningless, and appears to be a mere accessory to the action of the piece—a sort of verbal machinery tacked on to a succession of ballet and tableaux. The principal part and attraction of the spectacle seems to be the exhibition of women in novel dress or no dress, and in attractive attitudes or action. The closing scene is called Paradise, and as witness Hamilton expresses it, consists mainly 'of women lying about loose'—a sort of Mohammedan paradise, I suppose, with imitation grottos and unmaidenly houris. To call such a spectacle a 'dramatic composition' is an abuse of language, and an insult to the genius of the English drama. A menagerie of wild beasts, or an exhibition of model artistes might as justly be called a dramatic composition. Like those, this is a spectacle, and although it may be an attractive or gorgeous one, it is nothing more."

Since the time of that decision, repeated efforts have been made to secure an enlargement of the scope of copyright law so as to provide protection for various new forms of originality. Congress, in subsequent amendments to the act, has made provision, in additional classifications, for certain new types of composition, notably motion pictures. But none of these revisions, including the very significant one of 1909— to which detailed reference is made infra— have added anything to the act to change the original definition of a "drama" as enunciated by the courts. New media in which dramas could be presented were recognized. New provisions have sweepingly prohibited unauthorized dramatizations of any kind by any means whatsoever. Section 1(d) as enacted in 1909, 17 U.S.C.A.

§ 1(d). But there has been no statutory abandonment of any of the fundamentals previously held indispensable to a genuine dramatic composition.

The courts likewise have clung to first principles and have refused to extend the definition of a "drama" to include other forms of composition having no bona fide plot or story. Thus in Fuller v. Bemis, C. C., 50 F. 926, 928, the court, in holding a dance not copyrightable as a dramatic composition, declared: "Whatever may be the language of the opinion in Daly v. Palmer [Fed.Cas. No. 3,522] 6 Blatchf. [256] 264, the decision is not authority for the proposition that complainant's performance is a dramatic composition, within the meaning of the copyright act. It is essential to such a composition that it should tell some story. The plot may be simple. It may be but the narrative or representation of a single transaction; but it must repeat or mimic some action, speech, emotion, passion, or character, real or imaginary. And when it does, it is the ideas thus expressed which become subject of copyright. An examination of the description of complainant's dance, as filed for copyright, shows that the end sought for and accomplished was solely the devising of a series of graceful movements, combined with an attractive arrangement of drapery, lights, and shadows, telling no story, portraying no character, depicting no emotion. The merely mechanical movements by which effects are produced on the stage are not subjects of copyright where they convey no ideas whose arrangement makes up a dramatic composition."

Analyzing Seltzer's two copyrighted pamphlets, it is evident that in neither is there a plot or story or narrative in any accepted sense. True it is that in the first book, "Team No. 20," and in the second book, "The Italian Champion," are described as doing certain acts. But no one reading either work was ever intended to receive the impression that he was reading a synopsis of the precise events to be seen later in the evening. A reasonable spectator could only understand that here was an *illustrative* description of what *might* happen. The tenor of the whole text could give no other impression.

Basically these phamphlets have no fixed plot or story. There are no distinct characters, possessing individual personalities or names, or even personifying, as did characters in the old morality plays, generalized

virtues or vices. All we have here is a set of regulations for running a race. The fact that the exposition of the rules may be so artfully done as to constitute a literary masterpiece is no reason for considering the work other than a mere rule book. The mere fact that the race as staged is entertaining or thrilling or arouses great excitement cannot in itself change the essential nature of the composition so as to make it a drama. Barnes v. Miner, supra; Martinetti v. Maguire, 16 Fed.Cas. p. 920, No. 9,173. Accordingly, this court feels that plaintiff's pamphlets, lacking as they do at least one essential element of a true drama—a definite story structure—are not entitled to that protection under the Copyright Act designed and reserved for bona fide dramatic compositions.

Plaintiffs' counsel rely confidently on the case of Lloyd Corporation v. Witwer, 65 F. 2d 1. That well-considered opinion of the Ninth Circuit Court of Appeals is not, however, believed to be controlling here. In that case, the controversy arose over an alleged piracy of a magazine story by a motion picture production. The short story there involved had a definite "plot"— in the usual sense in which that word is understood—clearly suitable for dramatization in a photoplay, a dramatic form already accorded special treatment under the act. This court cannot conclude that the learned judges in the Lloyd Case intended to have principles undoubtedly applicable to dramas extended to cover forms of composition never accepted as dramatic in nature.

The same distinction may be drawn between the facts at bar and those involved in such cases as Sheldon v. Metro-Goldwyn Pictures Corporation, supra; Nichols v. Universal Pictures Corporation, 2 Cir., 45 F.2d 119, affirming D.C., 34 F.2d 145. These decisions proceeded on the unexpressed major premise that the works involved were manifestly dramatic compositions. The judges naturally decided only those issues actually before them, and did not deal with the particular problem here presented.

Nor is there anything in Empire City Amusement Co. v. Wilton, C.C., 134 F. 132, which conflicts with the views here expressed. In that case the dramatic rights of the famous "Alphonse and Gaston" cartoons were protected because an infringing play, using the same personalities, locale, and events, pirated not only the cartoons' characterizations but the cartoonist's play as well. There is no contention here that Seltzer's books contain distinctive characters which defendants have pirated.

What Seltzer really composed was a description of a system for conducting races on roller skates. A system, as such, can never be copyrighted. If it finds any protection, it must come from the patent laws. Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841; Brief English Systems, Inc., v. Owen, 2 Cir., 48 F.2d 555; Eichel v. Marcin, D. C., 241 F. 404. Included in his conception were certain stage devices which perhaps made the races produced under plaintiff's system more entertaining to an audience. But the authorities are insistent that a piece of scenery such as a penalty box amounts to nothing more than a mere mechanical device which cannot be copyrighted. See cases cited supra. It is clear also that the open-house or free-for-all feature is but a part of the system of rules, and cannot receive any greater protection than the system as a whole.

Even if plaintiffs' books be held to describe a game or sporting event, the rules thereof, as ideas, are not copyrightable. Whist Club v. Foster, D.C., 42 F.2d 482; Russell v. Northeastern Pub. Co., D.C., 7 F. Supp. 571. Nor is the system of staging a game or spectacle covered. Many cases heretofore, and more recently the "bank-night cases," have made that very clear. Affiliated Enterprises v. Gantz, 10 Cir., 86 F.2d 597; Affiliated Enterprises v. Gruber, 1 Cir., 86 F.2d 958.

But plaintiffs contend, and the special master is inclined to agree, that there was real novelty in Seltzer's application of certain features to a skating contest under the peculiar circumstances detailed and in the particular environment provided, even though those features were well known in other sports and were thus in the public domain. The court assumes that the special master means originality, not novelty, and on that basis is inclined to believe that insofar as that theory relates to a distinctive treatment of the generally recognized essentials of true drama, it may be sound. But insofar as it relates to the features of a game, or the spectacular incidents thereto, it cannot be followed. It rests on what the court conceives to be a misconception of the purpose and effect of the 1909 amendment to the Copyright Act. It is true that the statute was liberalized by the revision of that year, particularly by the last clause of section 1(d), which reserves to the au-

thor of a copyrighted work the exclusive right "to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever." But it should be noted that the clause in question appears in that subsection dealing with the various rights reserved to the authors of *dramas* or *dramatic works*. The only reasonable interpretation of the act would seem to be that Congress intended to protect those copyrighted works already within the purview of the act from infringing reproductions of any kind whatsoever. In our judgment it did not intend by implication to add new types of originality to those already commonly accepted as lying within the scope of the law. There seems no reason to believe that Congress desired to readjust the spheres of copyright and patent law, respectively, by enlarging the former to encroach upon ground generally conceded to be covered by the latter, if covered at all. It seems only reasonable to assume that Congress merely proposed to accord fuller protection to those intellectual achievements already recognized as lying within the sphere of copyright law.

▮ The above arguments effectively dispose of plaintiffs' contention advanced in oral argument that, in the idea of staging a purportedly transcontinental roller-skating race, Seltzer had a "distinctive treatment of a theme" which ought to be protected by copyright law. Such an argument would be valid only if the theme were an essential part of a true dramatic composition. Manifestly, such reasoning cannot successfully be applied to a game or race. Furthermore, plaintiffs' contention cannot prevail, resting as it must on the record in this case, which discloses ample evidence of the use by both sides of common source material in the public domain, and which raises very grave questions as to the *originality* of the allegedly copyrighted ideas. Were plaintiffs' contention to prevail in this case, might not the author of a copyrighted novel, containing a vivid and colorful description of one of the earlier football games, enjoin any future student body from employing the customary devices and patterns of the modern rooting section. As every enthusiast knows, the waving pom-poms, the quickly shifting color patterns, the intermission stunts, and in fact most of the much cherished atmosphere of college football has been associated with regattas, folk festivals, and outdoor sports since time immemorial. And

does not the "brek-ek-ek-ex, co-ax, co-ax" of the college yell date back at least to the antiphonal chant of Aristophanes' *Frogs?* Plaintiffs' sources are just as obvious, and his originality almost as questionable, as would be that of such a football-minded novelist.

▮ There are two additional arguments which reinforce the conclusion that plaintiffs can find no relief under the copyright laws. In the first place, even if plaintiffs have a "drama" (the only elements thereof that even remotely resemble a story being the passages relating to Team No. 20 and to the Italian Champion), there still is no showing that defendants dramatized those passages, and thereby infringed. There is no evidence to prove that defendants ever had in their race a Team No. 20 which was eliminated the first night; that the girl member of the team left the track "with tears streaming down her cheeks"; that an Italian champ ever skated at the Pan Pacific arena; or that, if he did, the finale of plaintiffs' second book was re-enacted.

▮ In order to infringe, under the Copyright Act, the production on the stage must obviously tell the same story as the copyrighted drama. If it tells another story or enacts another sequence of events, it is outside the protection afforded the registered work. Thus it would no longer be Shakespeare's *Julius Caesar* if the scene depicting the funeral of Caesar were to be played as an oratorical contest—with Brutus prevailing one night and Antony the next, or with chance or skill or some other arbiter determining the winner. So in Daly v. Webster, 2 Cir., 56 F. 483, at page 487, it is pointed out that, although the famous railroad rescue scene was copyrighted, any variation of the copyrighted version would not be covered by that particular copyright. The court said:

"In the case at bar the defendants at one time represented their play with no change in its material elements, except that the imperiled person was suspended over the track, a foot or two from the ground, instead of being fastened directly to the track itself. Manifestly, the grouped incidents, as thus altered, tell the same story as in the complainant's play. On another occasion, however, the defendants' play was so modified that the imperiled person was placed upon the track, so stupefied with some drug as to be unable in-

telligently to direct his own movements, and so environed (the scene is laid in a narrow tunnel) that it seemed reasonably certain he would be in his place of peril when the train arrived. So far, the change of incident made no material change in the story; but he was saved from death without the aid ·of any third person,—at one time, by staggering off the rails in time; at another, by striking inadvertently against the operating arm of a switch, which moved, and thus side-tracked the train. This grouping of incidents, dispensing, as it does, entirely with the rescuer, whose efforts to aid, and whose struggles to overcome the obstacles in ·his (or her) way, are an important part of the complainant's composition, tells a substantially different story."

Hence, since defendants did not reproduce the exact sequence of events in plaintiffs' so-called drama, no infringement has been shown.

■ In the second place, there is no evidence—and probably none could have been produced—to show that plaintiffs themselves ever staged or intended to stage a physical demonstration of Team No. 20 losing, or the nameless Italian champ winning, as described in the books. To have put on such a production would have destroyed the box-office appeal of plaintiffs' shows—and perhaps plaintiffs' standing in a court of equity —since the spectators paid to see what was advertised as an honest race, the results of which were to have been determined by free competition, not foreordained by an author's controlling plan. The absence of evidence on this point indicates quite clearly that Seltzer, in reality, and before suit was instituted, looked upon his books as descriptions of, and directions for, roller-skating races. He produced them as such. He did not regard them or stage them as "dramas," in any sense in which the term is ordinarily understood. He should not now be heard to claim that although *his* productions of the books are races, *defendants'* alleged production of the same books constitutes an infringing dramatization.

For the foregoing reasons the court is driven inescapably to the conclusion that no relief can be afforded the plaintiffs under the Copyright Act. Consequently judgment must be for the defendants on the first cause of action.

■ We turn now to the claim of unfair competition. The special master, after examining the evidence and personally witnessing defendants' race, was led to the conclusion that there was no unfair competition, since the ordinary sports-goer would not be misled into believing that he was attending one of plaintiffs' shows. A review of the evidence, too voluminous for discussion here, satisfies the court that, on the facts in the record, the master was correct in deciding that the element of deceit and misrepresentation was wholly lacking. Open competition cannot be made unfair merely because of the similarity of the spectacles. Such a similarity was inevitable when both were roller-skating races conducted in accordance with rules long familiar to anyone attending athletic events of that type. Furthermore, both spectacles made use of ideas and devices well known in such other sports as six-day bicycle racing, ice-skate racing, ice hockey, and foot races of various kinds. A similarity based on such common sources is neither culpable nor misleading to the public.

Judgment is accordingly rendered for defendants on both causes of action. All costs in the matter—including all fees and expenses of the special master and the court reporters, as well as counsel fees of defendants—are hereby taxed to the plaintiffs. Because of the complexity of the issues and the prolonged hearings before the master, the court fixes $500 as a reasonable fee for counsel for defendants Henderson, and $2,-000 as a reasonable fee for all the counsel of defendants Sunbrock, Spencer, Lee, and Lang. If the counsel for said defendants are unable to agree, within ten (10) days after the filing of this opinion, upon a satisfactory division among them of the said $2,000, the matter will then be determined by the special master, who for that purpose will serve without additional compensation. The funds impounded under the order of the court will be disposed of in accordance with the minute orders of this court. The restraining order heretofore entered in this cause is dissolved. Plaintiffs' bond heretofore posted in accordance with the orders of the court will not be exonerated until payment of the foregoing costs and until the faithful performance of its other covenants and conditions.

So ordered.