UNIVERSAL PICTURES CO., Inc., et al. v.
HAROLD LLOYD CORPORATION.

HAROLD LLOYD CORPORATION v. UNI-

VERSAL PICTURES CO., Inc., et al.
No. 11286.

Circuit Court of Appeals, Ninth Circuit.
May 12, 1947.
Petition for Modification Denied
June 20, 1947.

**357**

Julian T. Abeles, of New York City, Guy Knupp and Mitchell, Silberberg & Knupp, all of Los Angeles, Cal., for appellant Universal Pictures Co.

Lewinson & Armstrong and Joseph L. Lewinson, all of Los Angeles, Cal., for appellant Bruckman.

Harold A. Fendler, of Los Angeles, Cal., for appellant Harold Lloyd Corp.

Before MATHEWS, STEPHENS and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

The Harold Lloyd Corporation filed its complaint against Universal Pictures Co., Inc. and Clyde Bruckman, in the United States District Court for damages, injunctive and other relief. The action arises out of alleged infringements upon the copyright of the motion picture photoplay entitled "Movie Crazy". The defendants deny infringement but admit production and distribution of the alleged infringing motion picture photoplay entitled "So's Your Uncle".

The trial court found and awarded judgment to the plaintiff and against defendants for damages in the sum of $40,000, $10,000 for attorney fees, and granted injunctive relief against further violation of plaintiff's rights under its copyright. The court found the total amount of profits realized by the Universal Pictures Co. from distribution of the infringing photoplay was in excess of $20,000, 20% of which had been derived from the infringements. However, profits as such were not allowed in the award. The defendants appeal. The Harold Lloyd Corporation cross-appeals on the ground that the damages are inadequate. We shall occasionally refer to the plaintiff-appellee and cross-appellant as Lloyd and defendant-appellants and cross-appellees as Universal and Bruckman.

The motion picture photoplay "Movie Crazy", starring Harold Lloyd, was produced by appellant during the years 1931 and 1932 at a cost exceeding $650,000 and was copyrighted. Lloyd's ownership has been continuous and is unchanged. Bruckman was employed by Lloyd during production of "Movie Crazy" to assist as a writer and director and he was paid $42,900 for his services. During the year 1943, Bruckman was employed by Universal as a writer for a motion picture photoplay entitled "So's Your Uncle", the alleged infringing film.

The trial judge found that Universal and Bruckman knowingly, wilfully, and deliberately incorporated in "So's Your Uncle" a sequence of 57 consecutive scenes, constituting the "Magician's Coat Sequence", directly from "Movie Crazy". He further found that "So's Your Uncle" was exhibited in more than 5,000 theaters throughout the United States in deliberate violation of Lloyd's copyright after it had been given full information of the misappropriation.

The issues on appeal are as follows: (1) Is there substantial evidence to support the finding of fact that appellants deliberately misappropriated the sequence of 57 scenes, and if it did, does such fact constitute infringement of the "Movie Crazy" copyright; (2) Is there substantial evidence to sustain the finding that Lloyd suffered $40,000 actual damage thereby.

## The Infringement

The sequence of 57 scenes or the last 300 feet of reel 7 and the first 700 feet of reel 8 of "Movie Crazy", constituting the "Magician's Coat Sequence", are reproduced in the first 57 scenes and first 600 feet of the 4th reel of "So's Your Uncle". In "Movie Crazy", the star of the film attends a dinner dance given by a movie magnate's wife, having gained possession of an invitation by mistake. After being admitted, the star goes into the washroom and removes his coat. The coat falls and a magician hangs his coat on the hook just vacated. The star mistakenly puts on the magician's coat and returns to the dining room. He is introduced and is seated at the hostess' table and soon is dancing with her. Numerous comedy incidents begin to happen. He changes partners and the happenings continue—doves flutter, white mice crawl, eggs roll down the sleeves, all from the magician's coat when loosened. During the resulting melee, the magician enters and reproaches the star for stealing the coat. The star is discovered to be present without intended credentials and is literally thrown out.

In "So's Your Uncle", the leading character or star, disguised as his own uncle, two ladies and another man, go to a night club. While there, it becomes necessary for the star to appear as himself as well as his own uncle. Through the aid of a friend, a waiter in the club, he seeks a change of clothing. The waiter goes to the dressing room, takes a magician's coat and passes it to the star, who puts it on without knowing it to be a magician's coat. So clothed, he returns to the table in the character of himself. He dances with one of his table companions, and the comedy incidents occur, almost exactly as they do in "Movie Crazy" with practically the same results. The star leaves with his dancing partner and the waiter is blamed by the magician for the loss of his coat.

The main contention of both Universal and Bruckman is that Lloyd's photoplay is not a proper subject for copyright, hence no action for infringement lies. Secondly, they contend that there has not been such an appropriation as to constitute infringement. Universal asserts that there was not an appropriation of a substantial and material part of copyrightable material; the "gags" and "stage business" of the "Magician's Coat Sequence" have no dramatic quality; they are a subordinate sequence of events; the copyright does not cover any particular sequence of combination of "gags" or "stage business"; the scenes are merely comedy accretion to the story and having no story structure, are not dramatic; and finally, they are but a mere subsection of a plot and, therefore, not susceptible of copyright protection. Bruckman contends that the "comedy routine" of "Movie Crazy" is not within the Copyright Act because it is commonplace; it is dissimilar in the two pictures; it is entertainment but not dramatic composition, and it is slapstick and not dramatic composition. He further contends that he is not liable as an infringer as he had nothing to do with the production, release or exhibition of "So's Your Uncle".

The pertinent parts of the Copyright Act, 17 U.S.C.A. 1 et seq., are as follows:

Section 1. "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

" * * * * *

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever;".

Section 5. "The application for registration shall specify to which of the following classes the work in which copyright is claimed belongs:

" * * * * *

"(d) Dramatic or dramatico-musical compositions;

" * * * * *

"(l) Motion-picture photoplays;

"(m) Motion pictures other than photoplays.

"The above specifications shall not be held to limit the subject matter of copyright as defined in section 4 of this title, nor shall any error in classification invalidate or impair the copyright protection secured under this title."

■ We agree with the trial court that the appellee's photoplay is a dramatic work and within the meaning of Section 1(d) of the Copyright Act. In Vitaphone Corporation v. Hutchinson Amusement Co., D. C., 19 F.Supp. 359, the defendants made the contention that motion pictures consisting of one or more reels of "slapstick comedy" are not copyrightable under the Copyright Act, and the court made its answer at page 360: "I do not think there is much merit to this contention. All of the pictures are what are known in the trade as 'shorts'; that is, they run for periods from ten to twenty minutes, and are used as fill-ins between the feature pictures, newsreels, and other pictures on the program. The subjects are comedy, and while they are of the 'slapstick' type, they, nevertheless, have a story to them. * * * In the instant case, the reduction of the story such as it is to a motion picture is a dramatization of its work. I, therefore, find and rule that the copyrighted pictures in question are within the meaning and terms of the copyright law." [1] The subject is treated in 18 C.J.S. Copyright and Literary Property, § 117, p. 233, where the commentator states that motion-picture photoplays are dramatic works within the statute and may be infringed by any other motion picture making use of parallel situations.

■ Nor does the fact that Section 5, above quoted, of the Act lists dramatic compositions and motion pictures separately, imply that motion pictures are not, as suggested by appellants, dramatic compositions. Section 201.4, entitled "Subject matter of copyright", from the Code of Federal Regulations, Chapter II, Title 37 as Amended to October 1, 1941, relied upon by appellants, provides: "The designation 'dramatic composition' does not include the following: Dances, motion-picture shows; stage settings or mechanical devices by which dramatic efforts are produced, or 'stage business'; animal shows, sleight-of-hand performances, acrobatic or circus tricks of any kind; scenarios for, or descriptions of motion pictures or of settings for the production of motion pictures. * * *." This section is part of the description of Section 5 of the Copyright Act, which names 13 classes of works for which copyright may be secured, stating that the application for registration shall specify to which of those classes the work belongs. The above statement follows class (d) under the Act, which is "Dramatic and dramatico-musical compositions." The statement does not govern Section 1 (d) of the Act, but governs Section 5, which sets up a classification system for convenient registration in the Copyright office, wherein there are separate classifications for dramatic compositions and motion pictures, and it does not carry over into Section 1. As stated in Tiffany Productions v. Dewing, D.C., 50 F.2d 911, 914, "* * * there would seem to be no escape from the conclusion that the plaintiffs are nevertheless entitled to invoke the protection of section 1(d) on the ground that a 'motion-picture photo-play' is a 'dramatic work'. * * * To the contention that, since section 5 has separate classifications for dramatic or dramatico-musical compositions and for motion picture photoplays, therefore section 1(d) is not to be interpreted as embracing the latter, it is sufficient to point out that the classification of section 5 is

---

[1] This case was remanded by the Circuit Court of Appeals (93 F.2d 176), transferring it to the law side under Equity Rule 22, 28 U.S.C.A. § 723, Appendix. In 28 F.Supp. 526, the copyrights were held to have been infringed by the defendant. At pages 528, 529 the court made the following statement: "The first ground upon which invalidity of the copyright is based is that the photoplays in question showed works so trivial, vulgar and of such little artistic value that they did not merit the protection of the copyright laws. As has been stated above, these pictures were 'shorts' and the subjects were comedy, but they had a story, not of great intellectual value, to be sure, but it must be admitted they showed originality. * * * And it has been decided that motion picture photoplays of the type here in question are entitled to protection under the provisions of the Copyright Act."

merely for the convenience of the copyright office and of applicants for copyrights. Such interpretation is strengthened by the last paragraph of section 5."

█ The next contention is that the alleged infringement did not constitute an appropriation of a material and substantial portion of the copyrighted picture. The sequence in question consisted of 57 consecutive comedy scenes or 20% of the entire feature. According to the findings and the evidence, the whole sequence is intimately tied into the story, and is a main source of comedy for the picture as a whole. It plays an integral and essential part in carrying along the role of the star in the story. Further, the star-hero had been rejected by the heroine and the culmination of the magician coat episode was the motive and beginning of the reconciliation of the two, a necessity to the continuation and completion of the story.

█ The trial court found that the sequence had been "copied and misappropriated" by the appellants, that the characters, characterization, motivation, treatment, action and sequence of action were the same and had been deliberately and wilfully copied in their picture "So's Your Uncle". The evidence fully supports this view.

█ In 18 C.J.S. Copyright and Literary Property § 34, p. 176, the commentator concisely summarizes the applicable principles: "* * * a dramatic or dramatico-musical composition must possess some element of originality in order to be copyrightable. Ordinary incidents, stock situations, and oft told tales, are the common property of all playrights; they cannot be monopolized by copyright, although * * * a new treatment of a common subject may be protected by copyright. Dramatization of existing works involves the independent exercise of intellectual powers, and hence the resulting product is copyrightable." And at page 217: "A literal reproduction of the whole, or of substantially the whole, of a copyrighted work, if unauthorized, constitutes, an infringement, but an infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy. Paraphrasing is copying and an infringement, if carried to a sufficient extent. Complete or substantial identity between the original and the copy is not required. Copying and infringement may exist, although the work of the pirate is so cleverly done that no identity of language can be found in the two works. In such cases the question of infringement resolves itself into a question of fact on the evidence as to whether or not the copyrighted work was used and paraphrased in the production of the later work." And at page 218: "* * * the reproduction of a work from memory of the original constitutes copying and is an infringement."

Here, we find 57 consecutive scenes lifted almost bodily from the Lloyd product, not just the reproduction of an isolated single incident or event. The evidence is conclusive that the lifting was deliberately intended. Mere observation would illustrate the resemblance without any effort of dissection. See Dymow v. Bolton, 2 Cir., 11 F.2d 690. We quote briefly in the margin from Bruckman's testimony.[2]

2 "Q [to Mr. Bruckman]. You informed Mr. Yarbrough [producer and director of the picture], did you not, that the material particularly consisting of this magician's coat sequence which you were submitting for use in So's Your Uncle had been suggested by and patterned after a sequence that you had done in the Harold Lloyd picture Movie Crazy, did you not? A. That is right."
The appellant, Universal Pictures Company, Inc., is chargeable with knowledge and notice of that which was entrusted to their agent and producer, Jean Yarbrough, and to their agent and employee, Bruckman. The latter acted within the scope of their agency and employment when they wilfully incorporated into the Universal picture material which they knew to be "suggested by and patterned after" the appellee's picture. A corporation is chargeable with knowledge and notice of such matters becoming known to its agents and employees within the course and scope of their agency and employment. Fletcher, Cyclopedia of the Law of Private Corporations, Vol. 4, Ch. 42, Par. 2215, p. 3430, citing numerous authorities.

■ The whole picture need not be copied to constitute infringement. The mere copying of a major sequence is sufficient. In National Institute Incorporated for Improvement of Memory v. Nutt, D.C., 28 F. 2d 132, 135, the court quoted from West Publishing Co. v. Edward Thompson Co. C.C., 169 F. 833, 854, as follows: " 'To constitute an invasion of copyright it is not necessary that the whole of a work should be copied, nor even a large portion of it in form or substance, but that, if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute an infringement.' " See Anschl v. Puritan Pharmaceutical Co., 8 Cir., 61 F.2d 131, cert. denied 287 U.S. 666, 53 S.Ct. 224, 77 L.Ed. 374, and Chicago Record-Herald Co. v. Tribune Association, 7 Cir., 275 F. 797, 799, in which it is said that the unauthorized use, copy or appropriation is not to be neutralized on the plea that " 'it is such a little one.' " [3]

■ The appellants seek to defend their action by setting out dissimilarities, changes, omissions, additions, and variations, in that there was a different locale, different actors, different characters, different dialogues, and different costumes which were used to effect a different purpose. Evidence of these differences is relevant upon the question of infringement, but if such differences are shown to exist, the question remains for the trier of fact to decide the issue. Pellegrini v. Allegrini, D.C., 2 F.2d 610. And in Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc., 2 Cir., 73 F.2d 276, 278, cert. denied 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250, the court found the test of infringement to be whether the work is "recognizable by an ordinary observer as having been taken from the copyrighted source. Such is an infringement * * *." Slight difference and variations will not serve as a defense. In Nutt v. National Institute Incorporated for the Improvement of Memory, 2 Cir., 31 F.2d 236, 238, the court said "Copying is not confined to a literal representation but includes various modes in which the matter of any publication may be adopted, imitated, or transferred with more or less colorable alteration." [4]

---

[3] In 18 C.J.S., Copyright and Literary Property § 94, p. 218 the principle is likewise stated: "If so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially and to an injurious extent appropriated by another, that is sufficient in point of law to constitute a piracy. The question is one of quality rather than quantity and is to be determined by the character of the work and the relative value of the material taken, and it has been said that in deciding questions of this sort, the court must look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, diminish the profits, or supersede the objects of the original work."

[4] Compare Rush v. Oursler, D.C., 39 F. 2d 468, 472, wherein it was found that the interruption of stage performance by murder in theater of a person in the audience is a dramatic incident which per se is not copyrightable. The case contained similarity between three plays as to the actual occurrence of the murder but differed as to the solution of the mystery. The judge said, " * * * no one could by obtaining a copyright withdraw from others the right to portray such an occurrence in literary or dramatic form. The only right the owner of such a copyright would have is the right to prevent others from copying the form in which the author has chosen to dramatize such an occurrence for production upon the stage. It is not the content of dramatic or literary composition which is protected by copyright, but the form and sequence—'the incidental, yet essential, adornment and trimming.' It is not the subject, but its treatment, that is protected. * * * When in such a case similarities are found not in the plot or in its dramatic development or in the lines or action of the principal characters, but only in incidental details necessary to the environment or setting, there is no basis upon which to found a charge of plagiarism, and it may usually be said that such material is so unimportant and so trivial that its appropriation by copying, even if shown, would not be a substantial taking of copyrighted material."

In Curwood v. Affiliated Distributors, D.C., 283 F. 223, 228, the judge concluded: "My opinion is, however, that, even assuming the book to have suggested the Chinese den feature to the writer of the scenario, he has brought about

362

Appellants urge the defense of "public domain", claiming that all material in that category may be used repeatedly without charge of infringement. However, in Fred Fisher, Inc. v. Dillingham, D.C., 298 F. 145, 146, 150, the court limits that claim as follows: "Any subsequent person is, of course, free to use all works in the public domain as sources for his compositions. No later work though original, can take that from him. But there is no reason in justice or law why he should not be compelled to resort to the earlier works themselves, or why he should be free to use the composition of another, who himself has not borrowed. If he claims the rights of the public, let him use them; he picks the brains of the copyright owner as much, whether his original composition be old or new. The defendant's concern lest the public should be shut off from the use of works in the public domain is therefore, illusory; no one suggests it. That domain is open to all who tread it; not to those who invade the closes of others." See Detective Comics, Inc. v. Bruns Publications, Inc., 2 Cir., 111 F.2d 432; Stodart v. Mutual Film Corporation, D. C., 249 F. 507.[4a]

such a material alteration in the constituent parts of the series of events, and in the sequence of the events in the series, as to escape the charge of plagiarism with respect thereto. * * * I fail to find that the same impressions will be created, and the same emotions excited, in the same sequence and order, by a dramatic presentation of the Chinese 'den' scenes of the two stories in litigation."

The rule is well stated by Ball, The Law of Copyright and Literary Property, p. 371: "If a substantial number of incidents, scenes and episodes in an alleged infringing play are so nearly identical in detail, combination and arrangement with those found in the copyrighted book, to which the author of the play had access, as to exclude all reasonable possibility of chance coincidence and point inevitably to the conclusion that they were taken from the book, the play is a piracy, irrespective of the fact that some of the similarities may logically result from identity of subject matter, theme and locale."

In Chappell & Co. v. Fields, 2 Cir., 210 F. 864, the court held that the defendants in reproducing the plaintiff's scene with substantially the same dramatic situation were liable for infringement. As stated in Ball, supra, p. 373, "If, for instance, a scene in a play is substantially identical with an original scene in an earlier play, it is decidedly improbable, in works of this nature, that the resemblance was accidental, and justifies the conclusion that the differences in characters and dialogue are merely colorable and evasive with a view of disguising the plagiarism, and that the later one was adapted from the earlier." The author then discusses a case of infringement in which a railroad scene was held to be infringed by a similar scene in another play. The value and popularity of plaintiff's play depended upon that scene. The scene was held to be a dramatic composition suited to public representation. Thus, the public performance of the railroad scene in the defendant's play constituted infringement of the copyright in the railroad scene of the plaintiff's play. The author in describing the effect said at p. 374: "The defendant's railroad scene was identical in substance with the plaintiff's, with colorable variations, such as, the substitution of a section of railroad in a tunnel for a surface railroad; a cellar for a railroad station, as the place of confinement; a female for a male victim; and varying the mode of the rescuer's escape. In the plaintiff's play the idea that B was deliberately bound to the track with the intention of having him killed by the train was conveyed by the joint effect of the language spoken and movements performed in accordance with the written directions; while in the defendant's play the same idea was conveyed solely by the language uttered. The action, the narrative, the dramatic effect, the impression created and the series of events in the two scenes were identical."

[4a] In International Film Service Co. v. Affiliated Distributors, D.C., 283 F. 229, 234, the judge recognized that certain subjects are well within the public domain and not subject to copyright, but that such subject-matter may be so "utilized, as to setting, atmosphere, sequence of events, and detail of narrative, as to constitute an infringement upon the work of one who, while using old and well-known means, has created a novel situation." Banks v. McDivitt, 2 Fed.Cas. No. 961, p. 759, is cited, in which it is said, an author " * * * may work on the same original materials, but he cannot exclusively and evasively use those already collected and embodied by the skill and industry and expenditures of another.' "

See 13 C.J. 1146, in which the author sets forth the rule: "Originality in dealing with incidents familiar in life or fiction lies in the association and grouping

■ In answer to the point that the sequence lifted is commonplace, we find no evidence that they had ever previously appeared in like combination, arrangement or form. The direct examination of Bruckman supports this ruling.[5] The originality was displayed in taking commonplace materials and acts and making them into a new combination and novel arrangement which is protectible by copyright.[6]

■ The appellant's next point is that the appellee's sequence is merely "comic accretion" or consists merely of isolated "gags" and "stage business", and that material of that description is not copyrightable. However, it has been held that such material may be so combined with events as to become subject to copyright protection. See Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49. Further, the trial court found that the scenes in question may not be classified as mere "stage business", "gags", or "comic accretion"; that they may contain such details of acting as

is sometimes so labeled, but the whole sequence may not be reduced to that nomenclature. The evidence supports the conclusion apparently reached by the trial judge that an original combination of 57 scenes constituting a sequence of vital importance to the story, containing character, dialogue, and action cannot be termed mere comedy accretion, etc. Cf., Caruthers v. R.K.O. Radio Pictures, Inc., D.C., 20 F. Supp. 905; Dymow v. Bolton, supra.

■ The *means* of expressing an idea is subject to copyright protection, and where one uses his own method or way of expressing his idea, such adornment constitutes a protectible work. It is true that the mere motions, voice and postures of actors and mere stage business is not subject of copyright protection, but the sequence in question has literary quality in that it contains a story and is dramatic composition. See Chappell & Co. v. Fields, 2 Cir., 210 F. 864; Dymow v. Bolton, supra, 11 F.2d, p. 692.[7]

---

of those incidents in such a manner that the work under consideration presents a new conception or a novel arrangement of events. The copyright protects this element of originality and it is an infringement to appropriate a novel combination of old or stock incidents and situations." See 18 C.J.S. Copyright and Literary Property § 113.

[5] "Q. Prior to the construction and photography of the magician's coat sequence in Movie Crazy you had never seen that particular combination of material anywhere before, had you? A. Not that particular combination. * * *

"Q. By the Court: Was it old to have somebody get a magician's coat and put it on by mistake? A. No, as far as I know, that was original.

"Q. By Mr. Fendler: And the particular combination of gags with the particular sequence of action as finally depicted on the screen of Movie Crazy was original, was it not?

"The Court: As far as you know? A. As far as I know, yes."

[6] In Edwards & Deutsch Lithographing Co. v. Boorman, 7 Cir., 15 F.2d 35, 36, it was stated: "The materials used are all old and in the public domain, but the selection, the ordering and arrangement, are new and useful, and copyrightable. In deciding the question of infringements, the first and most obvious thing to do is to compare the productions themselves. The copyrightable feature of appellant's

production being a particular plan, arrangement, and combination of materials, the identity of such plan, arrangement, and combination of similar materials, found in appellee's production, not only suggests, but establishes, the claim of copying." See 13 C.J. 1146; 18 C.J.S. Copyright and Literary Property, § 113; Corelli v. Gray, 30 L.T.Rep. 116.

[7] The rule is well stated in Daly v. Webster, 2 Cir., 56 F. 483, 486, 487: "The effort of the composer is directed to arranging for the stage a series of events so realistically presented, and so worked out by the display of feeling or earnestness on the part of the actors, as to produce a corresponding emotion in the audience. Such a composition, though its success is largely dependent upon what is seen, irrespective of the dialogue, is dramatic. It tells a story which is quite as intelligible to the spectator as if it had been presented to him in a written narrative. * * * There must be a series of events, dramatically represented, in a certain sequence or order. In other words, there must be a 'composition', i. e., a work invented and set in order,—a work of various parts and characters, which, when put upon the stage, is developed by a series of circumstances."

In the same case at page 487: "It is plain that the author of such a work, where various incidents, in themselves common literary property, are grouped

The appellants rely largely on Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1, wherein it was contended that the appellants copied and appropriated substantial portions of the Witwer story including structure, plot, gags, sequences, etc. It was alleged that similarities between the motion picture and plaintiff's literary work run throughout the story and especially in a particular comedy routine. The circuit court in reversing the lower court's judgment held that there was no infringement on the ground that there was not any deception to the public, that borrowing commonplace materials and using them differently does not constitute infringement, and further any subordinate sequence which is not an integral part of the story, as here, is not protected. None of these conclusions derogate from our conclusions in the instant case, for the court found a marked similarity between the sequences in "Movie Crazy" and "So's Your Uncle", such a similarity held to be lacking in the Witwer case; and the sequence before us played such an important and integral part of the story that the two cases are clearly distinguishable. In the cited case the judge found that there had been no duplication of scenes, and if there was even an approximate duplication, it was only of a subordinate portion and "utterly commonplace and incapable of copyright monopoly" so that copying would in such instance have no relevance. A mere reading of the cited case by one at all familiar with the instant one will reveal other vital distinguishable facts.

---

to form a particular story, must be confined, in his claim to copyright, closely to the story he has thus composed, and that another author, who, by materially varying the incidents, materially changes the story, should not be held to be an infringer."

No such material variation was found to exist within the appropriated scenes herein.

Cf. Ball on the Law of Copyright and Literary Property, pp. 320, 321: "It has been said that the entire dramatic literature of the world is based upon about three dozen fundamental situations or plots which are the common property of all; but each of these basic plots can be given unlimited number of treatments. Copyright does not protect the plot but only the means of expression by which the plot is worked out. Two dramatic works may be built upon the same fundamental idea, contain instances of similarity in phraseology, characters and locale; yet if the plots are developed by means of substantially different incidents, showing dissimilarity in thought, action, character and treatment; and if the points of essential difference so far outnumber the points of similarity that it is apparent to the ordinary reader or play-goer that the two works bear no real resemblance to each other, there has been no infringement of copyright."

A distinctive treatment of a plot or theme is a proper subject for copyright and the sequence of incidents in the plot in conjunction with its distinctive locale and its original characterizations will be protected by the copyright law. Seltzer v. Sunbrock, D.C., 22 F.Supp. 621, 628. And in Fuller v. Bemis, C.C., 50 F. 926, 928, 929, the court stated: "It is essential to such a composition that it should tell some story. The plot may be simple. It may be but the narrative or representation of a single transaction; but it must repeat or mimic some action, speech, emotion, passion, or character, real or imaginary. And when it does, it is the ideas thus expressed which become subject of copyright."

It has been said that a series of pictures thrown in rapid succession upon a screen of a man fleeing from a crowd of women tells a single connected story. American Mutoscope & Biograph Co. v. Edison Mfg. Co., C.C., 137 F. 262, 267.

The rule has also been stated in 18 C. J.S. Copyright and Literary Property, § 34, p. 175 as follows: "If the composition tells a story intelligible to the spectator, it is immaterial whether it is done by means of dialogue or otherwise. Hence, it has been held that a series of incidents grouped in a certain sequence and realistically presented may constitute a 'dramatic composition' within the statute, although they are accompanied by very little dialogue, or none at all, as in the case of a pantomime. A written work consisting wholly of directions, set in order for conveying the ideas of the author on a stage or public place, by means of characters who represent the narrative wholly by action, is as much a dramatic composition designed or suited for public representation as if language or dialogue were used in it to convey some of the ideas. * * * It has been said that, in order for a composition to constitute a 'dramatic composition' within the meaning of that term as used in the copyright law, it is necessary that it should tell some story."

The appellants cite Seltzer v. Sunbrock, D.C., 22 F.Supp. 621, 628, 629, contending that the sequence fails to satisfy the requisite of a "story", in which the judge states: "The courts, in determining what constitutes a dramatic composition, have emphatically stated that there must be a story —*a thread of consecutively related events* —either narrated or presented by dialogue or action or both." The sequence, as already illustrated, fulfills this requirement, as found by the trial judge.[8]

■ Appellant, Bruckman, in seeking to escape liability, urges that he is not liable as an infringer in that "he had nothing to do with the production, release, or exhibition of the alleged infringing photoplay."

The trial judge found that Bruckman contributed material to "So's Your Uncle", which was patterned after the sequence he had done in "Movie Crazy" while employed by Lloyd. It was arranged at the request of Universal, and he deliberately chose material which he knew had been used in the Lloyd picture. His contention is demonstrably meritless.

■ We are of the opinion that the trial judge properly found that a writer is liable for damages as a contributory and participating infringer and joint tortfeasor.[9]

---

[8] See Daly v. Webster, supra, 56 F. at page 487, where the court found a scene, combining certain dramatic events, to be a dramatic composition and entitled to protection under the copyright laws: "The particular composition which is the subject of this action may be thus briefly stated: An individual is put in peril of his life by being placed by another upon a track over which a railroad train is momentarily expected to arrive, and so fastened that he cannot move from his dangerous position. From this peril he is rescued by a third person, who, surmounting obstacles, succeeds, at the last moment, in releasing him. With very little dialogue, and by the representation of successive incidents, this scene is displayed before the audience; and to its presentation, as the author conceived it, the important incidents grouped in the sequence he devised are essential. Together, they make up his story, or 'dramatic composition.' In their presentation individually, and without such grouping, there would be no such composition." The court went on to say that incidents of peril from railroad trains and rescue therefrom are common literary property, and that the composition therein was novel only because of the introduction of the rescuer. If another representation dispensed with the presence of the rescuer, it would tell a substantially different story and would not be an infringement.

[9] See Cain v. Universal Pictures Co., D.C., 47 F.Supp. 1013, 1017, wherein it was stated that "Infringement of copyright consists (1) of the alleged copying of a part of the plaintiff's work, and its inclusion in the scenario for the purpose of its (2) incorporation into the finished motion picture, (3) for exhibition purposes. If Taylor appropriated, as the Complaint alleged, a portion of the plaintiff's work and turned it over to the other defendants, his connection with the picture did not end then. The material was intended by him to be used in the motion picture to be produced from the story, which was to be exhibited to the public on its completion and release.

"So the wrong done to the plaintiff in a case of this character does not lie in the mere copying of his material, which, without publication or incorporation into a motion picture, would result in no injury to him. It consists of (1) the deliberate appropriation of a portion of his work and its delivery to others for (2) inclusion in the finished picture and (3) exhibition to the public.

"Therefore, conceding that the actual distribution of the picture, following its original release, was done by others than Taylor, the action is not barred, as to him, by the expiration of two years from the date of release. For the continuous exhibition of the picture is one of the aims of the composition of the script by him. He is, therefore, chargeable not only with the act of composing the screen play, but is also a participant in its incorporation into the motion picture and its subsequent exhibition."

See Gross v. Van Dyk Gravure Co., 2 Cir., 230 F. 412, 414, in which the following statement was made: "Why all who unite in an infringement are not, under the statute, liable for the damages sustained by plaintiff we are unable to see * * * as all united in infringing, all are responsible for the damages resulting from infringement." And in American Telephone & Telegraph Co. v. Radio Audion Co., D.C., 281 F. 200, 203, "Joint infringers are joint tort-feasors. * * * An infringer and one who induces or contributes to the infringement are likewise liable in solido, and so may be joined as defendants."

■ In the instant case Bruckman received no profits, but this does not relieve him from liability for the damages sustained by the appellee for his deliberate misappropriation of the appellee's property as a writer and director. The case of *Washingtonian Publishing Co. v. Pearson*, 78 U.S.App.D.C. 287, 140 F.2d 465, relied upon by Bruckman to the effect that authors are not liable for profits which other infringers derive from the infringement, discusses *profits* only. There is no merit in the contention that Bruckman is not connected or in any way responsible for the infringements, i.e., the public showing of the alleged infringing film. He presents no authority to support his view that he is not liable for *damages* as a contributory infringer.

■ The argument of Bruckman places emphasis on his statement that "Bruckman did not occupy a position calling for the exercise of discretion, and there was an intervening act on the part of his employer." He cites several cases to the effect that a mere employee or workman or servant is not liable for damages for the infringement of his employer. However, Bruckman himself selected the material which infringed appellee's picture and suggested that it be incorporated, and the mere fact that he told the producer where he had secured the material does not eliminate his own share of liability. The employer did not direct Bruckman to appropriate the material from another picture, nor did he or it make the selection. Thus he was acting entirely of his own volition in appropriating the material.[10]

■ Bruckman urges the point that a motion picture is not entitled to the protection of dramatic copyright unless it is based upon a copyrighted novel, stage drama, or book, and that there is no showing in the record that "Movie Crazy" was based on a copyrighted novel, drama, or book. Metro-Goldwyn-Mayer Distributing Corp. v. Bijou Theatre Co., 1 Cir., 59 F.2d 70, is cited as his authority, and he quotes in his brief from the opinion of the district court in that case, 50 F.2d 908, 909, which distinguishes Kalem Co. v. Harper Brothers, 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92, Ann.Cas.1913A, 1285, as follows: "The point decided was as to the scope of the copyright on the novel 'Ben Hur'."

"The present question is different: Here the film itself is the subject of the copyright. Nobody questions that the plaintiff has the exclusive right to control copying it. If the film were an ordinary photograph or transparency, nobody would contend that the mere exhibition of it violated the copyright. The understanding of Congress that it does not do so in the case of a moving picture film is established with very unusual clearness. The point was explicitly raised and discussed in connection with the amendments of 1912."

In the cited case the court held that a motion picture constituted a dramatization of the copyrighted novel. Further, that it was a dramatic production within the copyright law when based on a copyrighted novel and thus an infringement of the copyright on the novel, since by the statute the copyright owner is given exclusive control of the dramatization and dramatic performance of his work. The amendments of the Copyright Act of 1912 followed the Kalem case, in which motion pictures were held to be copyrightable. The court in the cir-

---

In "Copyright Law" by Herbert A. Howell, Ass'. Registrar of Copyrights, at p. 152, the general rule is stated: "While tort feasors are jointly and severally liable for the *damages* sustained by the plaintiff, they may not be severally liable for any *profits* in which they did not share." (Emphasis ours.)

10 The testimony of the producer, Yarbrough, is as follows:

"Q. Now, were you aware of the fact, Mr. Yarbrough, that this magician's coat sequence had, in substance, been used in a previous motion picture? A. I was told by Mr. Bruckman that material of this nature had been used two or three times, over a period of years, previously.

"Q. Did he tell you in what pictures? A. He told me that in some Columbia picture that he had been associated with they had done something along that line and that some years back Lloyd had done something of that nature." Bruckman in answer to a question as to the source of his material said: "I told Mr. Yarbrough at the time that I had done this in a Columbia picture a couple of years

cuit court opinion (59 F.2d 70) in the Bijou case discusses Tiffany Productions, Inc. v. Dewing, D.C., 50 F.2d 911, stating that the opinion in that case holds the projection of a photoplay film on a screen without the copyright owner's permission to be an infringement. [This means that photoplays are within Section 1(d) as dramatic works which gives exclusive rights to exhibit films, etc.] The appellant further urges his claim by the contention that the court's opinion expressly limits itself to motion picture photoplays, and does not refer to motion pictures other than photoplays, and quotes from the circuit court's opinion, 59 F.2d at pages 76, 77: "As we understand the term 'motion picture photoplays', they are motion pictures founded upon existing drama or dramatization of literary productions. In this respect they differ from 'motion pictures' under classification (m). The unauthorized exhibition of motion picture photoplays seems to have been consistently held, since the Kalem Case to be an infringement of a copyrighted dramatic work. * * * The bills of complaint do not allege that the copyrighted films are founded on copyrighted novels, dramas, scenarios, or other dramatic compositions. * * * By reference to the contracts it appears that we are dealing only with photoplays, which term connotes a moving picture founded upon a dramatic production. We hold that films which are founded upon copyrighted dramas or other dramatic compositions are protected under the provisions of section 1(d) of the Copy-

right Act and their unlicensed exhibition is an infringement of the copyrighted dramatic composition. We are not called upon to decide whether the unlicensed exhibition of a motion picture other than a photoplay would constitute an infringement of the copyrighted film of such a picture." [That is, whether such motion pictures could be within Section 1(d).]

The Bijou case was remanded to the district court, 3 F.Supp. 66, and the court was of the opinion that the circuit court did not require, in its opinion, a holding that an unlicensed exhibition of a print of a copyrighted motion-picture photoplay infringes the copyright only if the film is based on a copyrighted novel or dramatic composition. The court held that an unlicensed exhibition of a print of a motion-picture photoplay film, duly copyrighted, constituted an infringement, even though the film was not founded on a copyrighted novel or dramatic composition. The court, at page 73, states: "Motion picture photoplay films are either dramatic works entitled to protection under subdivision (d) of section 1, supra, whose unauthorized performance is an infringement of the performing rights given to dramatic works, or they are non-dramatic works entitled to protection under subdivision (b). It would seem that they are the former. The decision in Tiffany Productions, Inc. v. Dewing, et al., supra, which the Circuit Court of Appeals commends, decides that motion picture photoplay films are dramatic works entitled to protection under subdivision (d)."[11]

---

ago, at which time it had been suggested by and patterned after a sequence we had done in the Harold Lloyd motion picture Movie Crazy, as I remember it."

[11] As summarized in 18 C.J.S. Copyright and Literary Property, § 117, p. 233, the rule is stated as follows: "Motion picture photoplays and motion pictures other than photoplays are made distinct and separate classes of copyrights, and the provisions relating to infringement are applicable thereto. Motion picture photoplays are dramatic works within the statute, and are within the meaning of the words 'any transcription or record thereof', giving the owner of a copyrighted drama the exclusive right to make transcriptions or records for exhibition. They may be infringed by the multiplication or sale of copies, or by unlicensed exhibition, or by another

motion picture making use of parallel situations."

And in Ball on the Law of Copyright, p. 411, it is also stated that "A motion-picture photoplay is a 'dramatic work' within the meaning of section 1(d) * * *. However, motion pictures other than photoplays, not being embraced within the term 'dramatic work' as that term is used in section 1(d), cannot be protected by copyright under subdivision (d) of section 1. * * * Motion-picture photoplays are entitled to protection under section 1(d) and, after being copyrighted, their unauthorized performance is an infringement of the performing rights given to dramatic works, even though they are original photoplays and not founded upon a prior copyrighted novel or dramatic composition." See Howell, The Copyright Law, p. 23.

368

## Damages

Appellant - Universal presents several points in opposition to the court's award of damages: (1) The assessment of $40,000 is based on speculation and conjecture rather than facts; (2) the testimony of the appellee's president, Mr. Harold Lloyd, and two alleged experts of what the profits would be on the re-issue or re-make of the plaintiff's motion picture cannot support the court's award of damages; (3) there can be no recovery of profits of a new and untried venture, there being no provable data of past business to use as a basis for anticipated profits; (4) there is no evidence of any market value on the re-issue and re-make rights; (5) statutory damages may not be awarded where actual damages or profits are shown; (6) damages should not exceed $5,000 where there is no knowledge of infringement. Appellant-Bruckman alleges that no damage is proved since there was no data to prove damage and the damages awarded were based on conjecture.

The court found "That by reason of said infringement by defendants and each of them upon plaintiff's copyright, the Court finds that plaintiff has been damaged by defendants and each of them in the sum of $40,000.00 * * *."

"The Court further finds that plaintiff's rights to reissue and remake said motion picture photoplay entitled 'Movie Crazy' were substantially damaged and impaired by reason of said infringing acts of defendants but that the extent to which said rights were impaired and damaged did not and does not exceed the sum of $40,000.00."

The court concluded "That the plaintiff is not entitled to judgment awarding all or any portion of the profits which the defendant Universal Pictures Co. Inc. shall have made, received or derived from said copyright infringements by reason of the fact that the actual damages suffered by plaintiff due to said copyright infringements exceeds the aggregate amount of profits made, received and derived by said defendant from such copyright infringements."

Section 25(b) of the Act of March 4, 1909, Ch. 320, 35 Stat. 1081, August 24, 1912, Ch. 356, 37 Stat. 489, 17 U.S.C.A. § 25(b), Copyrights, provides in part: "To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement * * * or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated * * *."

█ The primary argument of the appellants rests on an alleged uncertainty of damages, and the claim that where damages are uncertain, they may not be recovered. The investment in the motion picture belonging to Lloyd was $652,000 and the particular sequence misappropriated by appellants cost approximately $188,000. There was substantial evidence showing that the infringed picture was valuable theatrical property and that the past profits and the cost of production were proper elements to consider in determining damages. The picture was exhibited in 6636 theaters throughout the United States. Several expert witnesses testified as to the values inherent in the picture, including the re-issue and re-make rights, assertedly destroyed by exhibition of the infringing picture. Such evidence amply supported the trial court's conclusions as to damage and the sum awarded.

█ The authorities support the doctrine that uncertainty as to the amount and extent of damage will not deprive the appellee of his recovery. In Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697, 53 S.Ct. 736, 739, 77 L. Ed. 1449, 88 A.L.R. 496, the court discusses a patent infringement in which it says, in part, "A patent is a thing unique. There can be no contemporaneous sales to express the market value of an invention that derives from its novelty its patentable quality. * * * But the absence of market value does not mean that the offender shall go quit of liability altogether. The law will make the best appraisal that it can, summoning to its service whatever aids it can command. * * * [Cases cited.] At times the only evidence available may be that supplied by testimony of experts as to

the state of the art, the character of the improvement, and the probable increase of efficiency or saving of expense." At page 699 of 289 U.S. at page 39 of 53 S.Ct. "Value for exchange is not the only value known to the law of damages. There are times when heed must be given to value for use, if reparation is to be adequate. * * * The market test failing, there must be reference to the values inherent in the thing itself, whether for use or for exchange."

In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, it is said: "It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage * * *. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. * * * In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making were otherwise."

See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 580, 90 L. Ed. 652, in which it is said: "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. * * *

" 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights. [Cases cited.]"

The appellants object to the use of the plaintiff's own testimony as to the value of the misappropriated property. The owner of personal property may al-

ways testify to its value. He may testify to the value of intangibles as well as the value of an advertising scheme, Brookins v. National Refining Co., 26 Ohio App. 546, 160 N.E. 97; also he may testify to the value of the good will of a business, White, Corbin & Co. v. Jones, 79 App.Div. 373, 79 N.Y.S. 583. Literary property is not distinguished from other personal property and is subject to the same rules and is likewise protected, Palmer v. De Witt, 47 N.Y. 532, 538, 7 Am.Rep. 480. California has held that plaintiffs may testify to the value of an unpublished manuscript prior to misappropriation in Barsha v. Metro-Goldwyn-Mayer, 32 Cal.App.2d 556, 90 P. 2d 371. See Yadkoe v. Fields, 66 Cal.App. 2d 150, 151 P.2d 906; Nathan v. King Features Syndicate, Sup., 32 N.Y.S.2d 519.

We are of the opinion that there is substantial evidence in the case to show that property rights and present existing intrinsic property values have been impaired or destroyed. The testimony of the expert witnesses clearly establishes that the picture's value has been lessened by the appropriation of an important sequence by the appellants, and it is common knowledge that the repeated use of comedy detracts from its force as amusement. The appellants object to the admission of expert testimony to show the value of the plaintiff's (appellee's) property and yet at the same time make use of alleged experts to sustain their position that the motion picture belonging to appellee had no value. Lloyd, president of the appellee corporation, as well as appellee's other witnesses, were found qualified to render testimony as to the value of appellee's motion picture before and after the misappropriation of the sequence in question.

See McGowan v. American Pressed Tan Bark Co., 121 U.S. 575, 7 S.Ct. 1315, 30 L. Ed. 1027; General Paint Corporation v. Kramer, 10 Cir., 68 F.2d 40; Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills, 3 Cir., 147 F.2d 209, 216. In the latter case the court said that courts have generally permitted the use of expert testimony to ascertain the extent of damages when documentary evidence fails. The second circuit in Sheldon v. Metro-Goldwyn Pictures

Corporation, 106 F.2d 45, upheld the use of expert testimony even if it only amounted to estimates, the case being affirmed by the Supreme Court in 309 U.S. 390, at page 408, 60 S.Ct. 681, at page 688, 84 L.Ed. 825, in which that court states: "By virtue of an extensive experience, they had an intimate knowledge of all pertinent facts relating to the production and exhibition of motion pictures. Nor can we say that the testimony afforded no basis for a finding. What we said in the Dowagiac case is equally true here,—that what is required is not mathematical exactness but only a reasonable approximation. That, after all, is a matter of judgment and the testimony of those who are informed by observation and experience may be not only helpful but, as we have said, may be indispensible * * *. We see no greater difficulty in the admission and use of expert testimony in such a case than in the countless cases involving values of property rights in which such testimony often forms the sole basis for decision." See Julian Petroleum Corporation v. Courtney Petroleum Co., 9 Cir., 22 F.2d 360, holding expert testimony as to value of oil that could have been produced if the well had been completed admissible as to damages.

**▮** The motion picture "Movie Crazy" was a world wide success when first shown, and it realized $400,000 profits at the time of a world depression. These facts are proper items for consideration of value.

The appellants seek to prove that where personal property has been injured that unless a market value can be shown, damages cannot be recovered. In opposing such a view we find the authorities support the rule as it is stated in 15 Am.Jur. 554-555: "The fact that personal property which is injured or destroyed by the wrongful or negligent act of another, has no market value, does not restrict the recovery to nominal damages only; its value or the plaintiff's damages must be ascertained in some other rational way and from such elements as are attainable. In such case the proper measure of damages is generally its actual value or its value to the owner. The value of an article may be shown by proof of such elements or facts as may ex-

ist—such as its cost, the cost of reproducing or replacing it, its utility and use * * *."

See Sinclair Refining Co. v. Jenkins Petroleum Process Co., supra, wherein the Supreme Court states that the absence of market value does not eliminate liability, and that where none exists the court uses the best evidence it has, such as the testimony of experts and values inherent in the thing itself. In Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, at page 156, 45 S.Ct. 465 at page 467, 69 L.Ed. 890, the court, in discussing a case where no market value of the article in question existed, said: "The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances probably could have been obtained for her on the date of the collision * * *. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Expert testimony was admitted to show value. See Agency of Canadian Car & Foundry Co. v. Pennsylvania Iron Works Co., 3 Cir., 256 F. 339; Sheldon v. Metro-Goldwyn Pictures Corp., supra.

**▮** The appellants argue that the damages found to have been suffered by appellee were rendered uncertain because of Columbia's infringements in "Local Boy Makes Good". Columbia Pictures Company produced a short by this title in which the sequence here in question was incorporated for comedy.

It is alleged that the court failed to find the extent to which the use of the same material, the magician's coat sequence, in the Columbia picture damaged plaintiff. The court in restricting its finding of $40,000 damages to the infringements by Universal and Bruckman in the picture "So's Your Uncle", took the effect of "Local Boy Makes Good" into consideration and expressed the opinion that this so-called "short" did minimize the damage suffered by Lloyd—a further factor in the estimate of damages. There was also testimony that the Columbia picture "short" had not affected the value of appellee's "feature"

motion picture in that the two were in different classes. In fact, the appellants attempt to show that no damage was suffered by the appellee by either picture.

The appellants seek to restrict recovery to $5,000 in that Universal established that it was unaware of the infringement, and it could not have been reasonably foreseen. Section 25(b) of the Copyright Act, supra, provides in part: " * * * and in the case of an infringement of a copyrighted dramatic or dramatico-musical work by a maker of motion pictures and his agencies for distribution thereof to exhibitors, where such infringer shows that he was not aware that he was infringing a copyrighted work, and that such infringements could not reasonably have been foreseen, the entire sum of such damages recoverable * * * shall not exceed the sum of $5,000 * * * nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him." The court, however, made a finding contrary to the contention as follows: " * * * that defendants and each of them at all times were fully informed and had full knowledge that they were infringing upon plaintiff's copyright and the court further finds that the defendant Universal Pictures Company, Inc., could and should have reasonably foreseen said infringements upon plaintiff's copyright."

The evidence fully supports the finding, in that it shows that both Bruckman and Yarbrough, the producer, were fully aware that the infringing sequence was "suggested and patterned after" the picture "Movie Crazy". The appellant-Universal is fully chargeable with notice and knowledge of facts known to its agents and employees while acting within the agency and employment. Fletcher, Cyclopedia of Law of Private Corporations, Vol. 4, Ch. 42, Par. 2215, p. 3430, and cases cited therein. There is no limitation of the kind in question where the court is awarding actual damages—the limitation in question follows the section on statutory damages, which are not involved herein.

It is contended by appellant-Universal that the exclusion of the testimony of Harold Lloyd and the witness Hirliman was error, and cites Rule 43(b) of the Federal Rules of Civil Proc., 28 U.S.C.A. following section 723c, as follows: "A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him * * * in all respects as if he had been called by the adverse party." The appellant's counsel called Lloyd as its own witness for purposes of expert witness testimony. Appellant's counsel attempted to impeach him. This, the court would not permit, and counsel was so informed. The testimony is as follows:

"Mr. Abeles: But if your Honor please, I am laying a foundation for certain testimony now. I promise your Honor this is very material.

"The Court: With that assurance I am going to let you proceed with the question, but it is understood this witness is your witness and you will be bound by his testimony.

"Mr. Abeles: That is correct sir.
" * * * * * *

"The Court: I am not going to permit you to impeach your own witness.

"Mr. Abeles: I respectfully submit he is not my witness.

"The Court: Yes, he is. You called him as your witness. He was excused and I told you this case was continued for a specific purpose, that is, to hear two experts on each side and you [counsel for appellant] issued a subpoena for this man and brought him into court."

The counsel for the appellant sought to show by testimony of the witness-Lloyd in another case that the story of his pictures meant nothing, only the comedy which was created, for his personality was important, that is, that the drawing power of his pictures was the personality of Lloyd as a star—and that since he was not a present-day box office attraction, the picture did not have the values that Lloyd was testifying to as an expert witness for the appellant. The appellant seeks to have it determined error to have refused to admit

said testimony. Appellant's counsel attempted to avoid, minimize and contradict the testimony of this witness, that the re-issue rights et cetera of certain of the witness' pictures were of great value, and the court would not so permit. The appellant's counsel agreed to call Lloyd only for purposes of gathering expert testimony, and it was for this purpose that the court continued the case. The court continued the case to permit appellant to call Harold Lloyd (and others) for expert testimony as to the damage incurred. There was no abuse of discretion in the court's refusal to permit the questioning of this witness concerning another Lloyd picture to discredit his testimony.

The testimony of Hirliman was offered to establish that he purchased the re-issue rights to one of the appellee's pictures for only $3,500 and that it had no value as no exhibitor would take the picture, there being no demand for the re-issue or remake rights of pictures of this nature, it not being a picture based on a stage play or novel. The court refused to permit testimony of the amount paid for the picture because "it is a collateral matter and in the second place, if the re-issue rights of a picture were sold we do not know whether it was comparable to the picture in issue. It does not mean anything to the court." An objection to a question of whether the witness was able to sell the picture to an exhibitor was sustained. The picture was a silent one, and it was suggested that it would not have re-issue value in the days of talking pictures, at which time it was purchased, so that the testimony was not material to this case, which involves re-issue value of a talking picture. The proffered testimony was properly excluded as it had little or no relevance in determining the value of the instant picture.

The appellant-Universal finally contends that the doctrine of laches and estoppel may be invoked to preclude recovery of damages or profits. It is alleged that there was an unexplained delay of 15 months before appellee asserted its claim of copyright infringement. The appellant rests its case on the seasonable nature of the alleged infringing work. The appellant contends that the appellee has the burden of showing its ignorance of the alleged infringement since December 3, 1943, and when and how the knowledge was first obtained, citing Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., 3 Cir., 284 F. 645, cert. denied 261 U.S. 623, 43 S.Ct. 518, 67 L.Ed. 832, to the effect that an unreasonable delay so places the burden. It is a reasonable rule that a copyright owner may not deliberately delay his prosecution and thereby speculate without risk with another's money to determine the success of the exploitation, but the evidence herein does not support such a premise. Appellant cites Haas v. Leo Feist, Inc., D.C. 234 F. 105, 108, to the effect that it is inequitable for an owner of a copyright, having notice of an infringement, to remain inactive while infringers spend large sums of money and then intervene only when the speculation proves a success. However, the quotation used is followed by other pertinent language. "If the defendant be a deliberate pirate this consideration [laches] might be irrelevant, and I think it such * * *." And as stated in Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., 3 Cir., 284 F. 645, "Mere delay will not ordinarily bar a suit for an injunction against a naked infringer." Lloyd testified that he objected to the infringement "not very long" after his attention was directed to the infringement, but that he did not recall the exact date he discovered it. On March 20, 1945, notice was written to the appellant of the fact of an infringement of a picture which appellant released several months before.

Appellant further contends that this course of action constituted an equitable estoppel which prevents recovery in damages, that is, that a long period of inaction constitutes such laches as to create an equitable estoppel. The appellant cites Pollitzer v. Foster, 6 Cir., 59 F.2d 901, wherein such a rule was presented but with the further statement that the delay of action by the copyright owner must be of such a character as to justify a belief on the part of the infringer that there is assurance of an immunity from a claim of liability. The trial judge did not find such a delay in the instant case, and we do not think his discretion was abused. The appellant-Universal admitted in its answer that they re-

ceived the written notice testified to. It is contended that the notice was offered by appellants into evidence to "establish an estoppel." Such a purpose was not shown nor did they in any way plead estoppel. Further, no one objected to the introduction of the notice. Such an instrument would ordinarily be shown to prove that there was a notice sent and received at that particular date. Appellee would not stipulate that it was the first notice of such a claim since it contends that the appellants were under continual notice of the misappropriation. It is asserted that the defense of estoppel and laches need not be affirmatively pleaded where the issue is tried by express or implied consent of the parties. The court received the evidence offered on the subject and decided there was neither laches not estoppel. The question can only be: Did the evidence support the adverse finding?

■ Universal asserts that the finding that the exhibition of its picture continued after notice of infringement constitutes reversible error. The court in making the finding of facts states that "The court furthermore finds that the defendant-Universal Pictures Co. Inc., continued to release and distribute and cause to be exhibited to the general public throughout the United States, said motion picture entitled 'So's Your Uncle' with notice and knowledge of plaintiff's rights in the premises and of the continuing infringements upon plaintiff's copyrights and said defendant will continue to infringe upon plaintiff's copyright upon its motion picture photoplay entitled 'Movie Crazy' unless permanently restrained and enjoined from so doing by order and injunction of this Court." Such a finding was appropriate in support of an injunction which the court found to be necessary for the protection of Lloyd's rights. The defendant-appellant asserts that the plaintiff-appellee stipulated upon trial that upon receipt of the notice of infringement the exhibition of the picture of defendant's picture had been stopped, and the court in its finding contradicted the stipulation and committed reversible error. The testimony to which appellant refers was in fact a colloquy between attorneys in the case and is as follows:

"Mr. Abeles: We sent out the—the defendant Universal Pictures Company sent out instructions to all their exchanges to stop the exhibition of the picture until this matter had been determined.

"Mr. Fendler: I will stipulate such instructions were given. I will not stipulate the instructions were complied with.

"Mr. Abeles: To the best of our knowledge they were complied with.

"Mr. Fendler: You do not contend the plaintiff is not entitled to an injunction, do you?

"Mr. Abeles: No.

"Mr. Fendler: Very well, we will so stipulate. Shall I call my witness?"

The testimony speaks for itself and answers the contention of the appellant. This testimony shows that the appellants did not question the appellee's right to an injunction and the questioned finding is in accord therewith.

The appellant-Bruckman relies for the most part on the contentions made by appellant-Universal. He objects to the use of opinion evidence in that one side contends for $300,000 damages due to the infringement while the other side asserts that there isn't any damage and claims that the $40,000 set by the court was a mere guess.

■ He independently asserts that Section 1(d) does not give a monopoly of remake rights to the plaintiff for his picture "Movie Crazy", quoting from White-Smith Music Pub. Co. v. Apollo Co., 209 U.S. 1, 17, 28 S.Ct. 319, 323, 52 L.Ed. 655, 14 Ann. Cas. 628, to the effect that the reproduction of sheet music by music roll was not an infringement of the copyright of the music with the following statement: "The statute has not provided for the protection of the intellectual conception apart from the thing produced, however meritorious such conception may be, but has provided for the making and filing of a tangible thing, against the publication and duplication of which it is the purpose of the statute to protect the composer." And in Corcoran v. Montgomery Ward & Co., 9 Cir., 121 F.2d 572, 573, the court states: "Appellant relies also on the provisions of subsection (b), giving the exclusive right 'to

translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work * * *.' It is claimed that the recording with music constitutes the making of another 'version' of the poem, and also amounts to a dramatization of it.

"The precise meaning of the phrase 'any other version' appears not to be settled by the decisions. The phrase has been held to apply to abridgements. * * * [Cases cited.] It has been suggested that it refers to versions of a literary nature. Ladas, The International Protection of Literary and Artistic Property (1938) p. 779. However that may be, we think what was done here does not constitute the making of another version of the poem within the meaning of the statute. In the committee report referred to in the above note it was said that subsection (b) is 'consistent with the existing law as construed by the court.' Something new would be imported into the law if appellant's position were to have judicial approval. White-Smith Music Pub. Co. v. Apollo, supra. And, if the phrase were to be construed so broadly as appellant claims it should be, the many provisions of the act dealing with particular versions would be rendered superfluous, as, for example, the provision in subsection (d) giving the proprietor of a dramatic work a monopoly of the right 'to make or procure the making of any transcription or record thereof.'" In Arnstein v. Edward B. Marks Music Corporation, 2 Cir., 82 F. 2d 275, the court said: "Verbally our error arose from not reading the words, 'the same,' in Rev.St. 4952, as referring back to the words, 'the work.' The 'sole liberty of printing, publishing and vending' the 'work' means the liberty to make use of the corporeal object by means of which the author has expressed himself; it does not mean 'the sole liberty' to create other 'works,' even though they are identical. Were it not so the man who first made and copyrighted a photograph under section 5(j) of title 17 U.S.Code, 17 U.S.C.A. § 5(j), could prevent every one else from publishing photographs of the same object."

We do not see how these cases rule out the remake rights of a motion picture under section 1(d) which gives the right "to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever * * *."

In Bruckman's reply brief, it is contended that the court impliedly held the expert testimony to be untrue since his figure differed from those figures suggested by the expert witnesses. This is not true, since the court made allowances for certain limiting factors to scale down the damages. The court did not make an arbitrary finding of value and completely disregard the opinion of the experts, for it considered other evidence which limited the values placed thereon by the experts, such as the Columbia short, the age of the picture, star appeal, the wide margin between cost of picture and claimed damages, and several other such limiting factors. There was also considerable evidence recognized which supports the value placed thereon, such as a present demand and an open market for films successfully displayed, the present day number of re-issue and remake pictures being advertised, and the fact that people remember the picture for this sequence. The judge determined actual damages in finding the lessened value of the copyright by reason of the infringement.

### Cross-appeal

Lloyd brings a cross-appeal from the judgment for damages, as found by the trial court.

■ It first contends that there was error in sustaining objections to its offer of proof relating to the value of re-issue and remake rights in comparable sound and talking motion pictures starring Harold Lloyd. The offer of proof as to the alleged value of another picture was first suggested by Lloyd's counsel and the court stated that the offer might be submitted in writing at a later time. When the writing was submitted after considerable length of time, the court in its discretion determined that the evidence should be rejected, such evidence being irrelevant. We think the court

did not err in the circumstance of our case by holding that the value of another picture was inadmissible to prove the value of the instant picture.

Lloyd asserts that the damages are inadequate, having pleaded general damages in the sum of $200,000 and special damages arising from the destruction of re-issue and remake rights in the sum of $200,000. The trial court found that Lloyd was damaged by Universal and Bruckman in the sum of $40,000. As stated in Lloyd's cross-appeal brief, "It is plaintiff's [Lloyd's] contention that general damages might be properly found by a court predicated upon evidence of the nature and value of plaintiff's property; the scope and extent of its misappropriation, and proof of the number of infringing performances in theaters in which the plaintiff's property has been used without its consent. (See United States Frumentum Co. v. Lauhoff, 6 Cir., 216 F. 610, at page 617, where 'general damages' are expressly defined as 'damage not resting on any of the applicable, exact methods of computation but upon facts and circumstances which permit the jury or the court to estimate in a general but in a sufficiently accurate way the injury to plaintiff caused by each infringing sale.')"

The evidence as to general damages in support of Lloyd's contention consists of the following: The motion picture production cost of $652,853.86, distribution cost of $414,010.14, 21 months of production, cost of 11 writers ($66,773.67) to write the story; the gross income from distribution of $1,439,182.21 and the net profit of nearly $400,000 during the depression period; the picture was released in more than 50 countries; the sequence infringed upon, cost the appellee approximately $188,000; the infringing picture was exhibited in 6,636 theaters throughout United States with approximately 30,000 infringing performances. The fact that there is no market value placed on the picture does not relieve the infringer of damages according to authorities cited by Lloyd, nor do they have to be susceptible of exact certainty.

By reason of the destruction of the rights to re-issue, reproduce and remake the motion-picture photoplay "Movie Crazy," Lloyd alleges that it has also been special-ly damaged in the sum of $200,000, over and above the general damages contended for. The trial court found that the total damages did not exceed the sum of $40,000. Lloyd introduced expert witnesses to testify to the value of the rights in question. The court found that they were qualified to testify, and these witnesses gave considerable testimony on the losses held to have been caused by the infringement. They all felt that these rights were destroyed as a result of the infringement, and that such loss amply supported the figures claimed by Lloyd. The Universal and Bruckman introduced expert witnesses to the effect that there was no damage, or at the most nominal damage. Lloyd questions the qualifications of these witnesses, and contends that there is no substantial evidence to overcome or impeach the testimony of its own experts.

 The court took into consideration the evidence in support of alleged values as well as the age of the picture, the conflicting testimony as to the extent of destruction of value, the popularity of the star at the time the picture was produced and other proper factors. We are of the opinion that the evidence before the court warranted the trial court's determination of damages.

 Lloyd contends that the court further erred in refusing to award any of the profits to it. The court stated that since the damages sustained by Lloyd exceeded the profits made by Universal, Lloyd was not entitled to any or all of the profits. Lloyd claims that the statute provides otherwise and sets it out as follows: "Section 25. Infringement. If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable: * * * (b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement. * * *" 17 U.S.C.A. § 25(b).

Lloyd cites several authorities to the effect that this section provides for the recovery of both damages and profits. See Amdur, Copyright Law and Practice, p. 1117; 18 C.J.S. Copyright and Literary Property § 135, p. 248; Sebring Pottery Co. v. Steubenville Pottery Co., D.C., 9 F.Supp.

384. It claims that where an infringer has deliberately misappropriated, the infringer loses both damages and profits; and the Sheldon case, supra, does not prevent this result as no issue as to damages was raised in that case. The award therein consisted of profits only, the issue being whether they should receive all or part of the profits.

We are of the opinion that the court was justified in awarding damages alone.[12]

In Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 400, 401, 60 S.Ct. 681, 684, 84 L.Ed. 825, the court states that "In passing the Copyright Act, the apparent intention of Congress was to assimilate the remedy with respect to the recovery of profits to that already recognized in patent cases. Not only is there no suggestion that Congress intended that the award of profits should be governed by a different principle in copyright cases but the contrary is clearly indicated by the committee reports on the bill. As to section 25(b) the House Committee said: 'Section 25 deals with the matter of civil remedies for infringement of a copyright. * * * The provision that the copyright proprietor may have such damages as well as the profits which the infringer shall have made is substantially the same provision found in section 4921 of the Revised Statutes [35 U.S.C.A. § 70] relating to remedies for the infringement of patents. The courts have usually construed that to mean that the owner of a patent might have one or the other, whichever was the greater. As such a provision was found both in the trade-mark and patent laws, the committee felt that it might be properly included in the copyright laws'." [13]

Lloyd further asserts that the trial court showed a prejudicial attitude towards the amount of damages allegedly sustained by it in as much as it referred to "Hollywood" figures as being all out of line and exorbitant. The statements complained of between court and counsel on that subject are printed in the margin.[14]

[12] In Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 208, 62 S.Ct. 1022, 1025, 86 L.Ed. 1381, the court said: "If the petitioner suffered damages beyond the loss of profits the decree should provide for the assessment of such damages * * *." And in Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 6 Cir., 95 F. 2d 978, 983, a patent case, the court said: "The statute does not allow recovery of profits plus damages, but gives the patentee his choice or what is, in substance, the same, the profits plus any damages in excess thereof. * * * Only in Dowagiac Mfg. Co. v. Deere & Webber Co., 8 Cir., 1922, 284 F. 331, were both profits and the lesser damages allowed." The court cites numerous cases to support its view. In Underwood Typewriter Co. v. E. C. Stearns & Co., 2 Cir., 227 F. 74, 82, the court says: "Indeed, the fact that no profits were made may make it less difficult to assess the damages, as the law does not permit a duplication in damages of what has been received in the shape of profits."

[13] In Riverside Heights Orange Growers' Ass'n v. Stebler, 9 Cir., 240 F. 703, 715, citing Root v. Railway Co., 105 U.S. 189, 26 L.Ed. 975, referring to the same section of the Revised Statutes, states that "'Under the act of Congress of 1870, he [the patentee] may recover damages in addition to the profits to be accounted for by the defendant; but, as the recovery is limited by the act to the actual damages, it is manifest that the recovery of damages and profits is not intended to be double, but that, when necessary, the damages are to supplement that loss of the complainant which the profits found to have been received are insufficient to compensate, subject to the power of the court as to their increase, as in case of verdicts.'

"That the additional damages are to compensate patentee only for such loss as he may have sustained in excess of the infringer's gains and profits is stated in clear and unambiguous terms in the opinion in Tilghman v. Proctor, 125 U. S. 136, 149, 8 S.Ct. 894, 901, (31 L.Ed. 664) * * *.

"The foregoing requires a decree in favor of plaintiff for such sum as will fully compensate him for all losses occasioned by defendants' infringement (such losses exceeding the amount of defendants' profits)."

[14] "The Court: The only thing is, Mr. Fendler, you must remember that this Court is not accustomed to dealing with figures that they deal with in Hollywood. They always have a couple of extra ciphers on anything they deal with out there."

"The Court: * * * As I have indicated to counsel, the figures that come out of Hollywood sound like the national debt and they do not register very strongly with this court, and if they did reg-

Upon this point we think Lloyd makes more of it than it deserves. The court used extravagant and figurative language to express his conviction that the damages were nowhere nearly as great as the allegations set forth. He was merely warning counsel that talk of or opinion evidence that the damages ran into the hundreds of thousands of dollars was idle. He had listened to the facts, and he was well within his judicial function to openly state that his judgment precluded his finding any such large money damage. A quotation from Lloyd's brief is significant: "We do not mean to charge the trial judge with being arbitrary, capricious, or unreasonable. We feel that Judge Harrison attempted to reach what in his opinion was an honest and fair judgment."

It is next alleged by Lloyd that there was error in apportioning 20% of Universal's profits to their copyright infringement.

The assertion sets forth that there is no evidence to sustain the arbitrary allocation of 20% of the profits of the infringing picture to the copyright infringements. It is contended that in the Sheldon case, supra, relied upon by the court for apportionment principles, the defendant offered evidence to show what proportion of the profits were justly attributable to the infringing material. Cases are then cited to the effect that where portions of a copyrighted work are so intermingled with the rest of the work that they cannot be distinguished from it the entire profits from the work will go to the owner of the copyright, Callaghan v. Myers, 128 U.S. 617, 665, 9 S.Ct. 177, 32 L.Ed. 547; Belford v. Scribner, 144 U.S. 488, 508, 12 S.Ct. 734, 36 L.Ed. 514; Davilla v. Brunswick-Balke-Collender Co., 2 Cir., 94 F.2d

567. It is claimed that since there is no basis or measure of apportionment, and both sides agreeing thereto, the court erred in arbitrarily setting 20% as a proper apportionment.

The Sheldon case, supra, illustrates the use of apportionment in infringement cases, and held that 20% was a proper apportionment of profits for the contribution of an infringing play. The opposing counsel contested the use of any apportionment method. The court suggested that if counsel felt that 20% was inadequate that he could put in evidence to that effect, however, counsel's argument remained as before—no apportionment is possible. The court felt there, as here, it was not possible to apportion the profits to a strict certainty, but that the court could make a just apportionment. See Twentieth Century Fox Film Corp. v. Stonesifer, 9 Cir., 140 F.2d 579, 583, 584, adopting the rule of the Sheldon case, in which case the court felt that an apportionment avoids an unjust course in that the provision for recovery of all the profits is qualified where the infringer's labors have also contributed to the ultimate result; an award of profits not due to an infringement would constitute an unauthorized penalty. There was adequate testimony on which to base an apportionment. The judge viewed both pictures and heard testimony on both pictures' values, and in our opinion, the Sheldon case permits the allocation made herein; it was within the trial judge's jurisdiction and discretion to determine that 20% was a fair figure.

The final claim of Lloyd sets forth that where damages as well as profits are difficult of ascertainment, the court should award statutory damages in such sum as shall appear to be just. The statute is

---

ister with the special master I would not follow them."

"The Court: Counsel, can't you see the Court's viewpoint after everything I have said? I will say it again. These figures of $100,000, $200,000 are entirely out of line. You might as well mention the national debt. Now, if you want to proceed along the same line, I will give you all the leeway you want. You may fill up the record with it and make it as large as you want. I will sit here

and listen, but as far as having any material weight with this court is concerned, it will not."

"The Court: * * * At different times during this case when I have endeavored to bring the parties together I warned you that probably when we finished neither side would be happy because when one person insists on $300,-000 I move the decimal point over. * * *"

set forth providing that the copyright owner may recover from an infringer (17 U.S.C.A. § 25) "* * * in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated * * *."

"Fourth. In the case of a dramatic or dramatico-musical or a choral or orchestral composition, $100 for the first and $50 for every subsequent infringing performance; * * *."

Lloyd contends that the court has discretion to award statutory damages, as appear just, in place of damages and profits if the court should find that the nature of the case requires such an award. That since the damages were speculative and conjectural that this alternative should be considered by this court. The claim is for statutory damages of $50 for each of the theaters (6,636) in which the infringing picture was exhibited, rather than each infringing performance, the latter being an excessive claim, and an unjust burden.

 Award of statutory damages in the terms of the statute is proper only in the absence of proof of actual damages and profits. The court having found the extent of both, the point fails. The court awarded actual damages, holding the award on that basis as adequate without resorting to the use of statutory damages. We find no error in this course. Such conclusion is in accord with cases from which we quote briefly. Lloyd cites Fargo Mercantile Co. v. Brechet & Richter Co., 8 Cir., 295 F. 823, 829: "We think election to award what are known as statutory damages in lieu of actual damages vests with the court and that it is for the court to decide what kind of damages best fits the case." We submit that the court made its election. In Turner & Dahnken v. Crowley, 9 Cir., 252 F. 749, 754, the court states: "The duty of the court was to award damages as justified by the nature and circumstances of the case as developed upon the trial."

The trial court, of course, has the advantage of having the witnesses before it. In each of its rulings the court was supported by the law, and in each of its findings the court was supported by material and relevant evidence, substantial in character. Tested by the old equity rule or by Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A. following section 723c, no reversible error is found in the case.

Affirmed.